No. 14216

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

RICHARD CECH, as Administrator of the
Estate of Kelly Cech, Deceased, and
ARLENE CECH, Deceased, and as Guardian
of the Estate of Bruce Cech and Kerry
Cech, Minor Children,

        Plaintiffs and Respondents,

-vs-

THE STATE OF MONTANA,

        Defendant and Appellant.

---

Appeal from:  District Court of the Sixth Judicial District,
             Honorable Jack D. Shanstrom, Judge presiding.

Counsel of Record:

    For Appellant:

        Corette, Smith and Dean, Butte, Montana
        Dolphy O. Pohlman argued, Butte, Montana

    For Respondents:

        Berger, Anderson, Sinclair & Murphy, Billings, Montana
        Richard Anderson argued, Billings, Montana

---

Submitted: September 14, 1979

Decided: DEC 12 1979

Filed: DEC 12 1979

Thomas J. Kearney
                  Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Plaintiff Richard Cech, as personal representative of the estates of his wife, Arlene Cech, and his child, Kelly Cech, and as guardian of the estates of his children Bruce and Kerry Cech, sued the State of Montana under provisions of the Montana Tort Claims Act for damages resulting from an automobile accident on Interstate 90, approximately eleven miles east of Whitehall, Montana. The jury trial began November 14, 1977, in the District Court of the Sixth Judicial District, Park County. The jury returned four separate verdicts for plaintiff as follows:

| | |
|---|---|
| For the estate of Arlene Cech (deceased) | $15,000 |
| For the estate of Kelly Cech (deceased) | $35,000 |
| For the guardian of Bruce Cech (minor child) | $25,000 |
| For the guardian of Kerry Cech (minor child) | $25,000 |

From the entry of judgment on the verdicts, the State appeals. The original opinion in this case was issued August 1, 1979. A petition for rehearing was filed August 14, 1979, and this Court ordered a rehearing on August 22, 1979. The case was set on the September calendar, rebriefed and reargued to the Court.

The State raises the following issues for our review:

1. Whether the District Court erred by denying the State's motions for directed verdict made at the close of plaintiff's case-in-chief and at the close of all the evidence?

2. Whether the District Court erred in admitting evidence of subsequent remedial measures?

-2-

3. Whether there is substantial evidence to support the jury verdict in favor of plaintiff?

The single-vehicle accident subject of this action occurred on the afternoon of November 29, 1974, on Interstate 90, on a portion of that road known as Cottonwood Hill. Richard Cech was driving the family car, a 1967 Rambler, west on the freeway. His passengers were his wife, Arlene, and three of their seven children. The weather on the day of the accident was described by Cech as "sunshiny," "cool," "clear and fairly nice." He testified that the road was "fairly dry" and "in good shape" from Livingston, the town from which they were traveling, to Bozeman. From Bozeman westward the conditions were different; the left lane was snow-packed, but the right lane, in which he was driving, was "dry" according to Cech. He testified that near the hill on which the accident occurred both lanes had started to clear up and there was less snow on the road.

Cech further testified that he was driving around 55 miles per hour and had maintained that speed almost all the way. His car did not have snow tires. He stated that he did not recall seeing the roadside sign warning of ice on the next three miles of highway, within which space the accident occurred. The automobile, at an estimated speed of 55 to 60 miles per hour, passed from a dry section of the highway onto an icy section on a shaded curve. The automobile went into a skid, and Cech lost control.

Cech stated that he did not brake while on the highway or once the car left the pavement. However, once the car was on the "field or pasture" as he described it (the State calls it the "recovery area"), he testified that he must have been braking because "the car was coming to a slower

-3-

motion." The car did not stop within this recovery area but went over the edge into a ravine.

Cech's wife was killed in the accident. One son, Kelly, died in a Great Falls hospital about a week later. Cech and the other two boys sustained relatively minor injuries from which they recovered.

At the time of the accident, guardrails protected this particular curve except for a portion of the curve approximately 600 feet in length. Through this gap of guardrail, the Cech automobile traveled into the recovery area. Evidence showed that the automobile skidded 84 feet 2 inches on the oil mat of the highway, 378 feet 1 inch on the recovery area, and then over the edge of the recovery area into the ravine where presumably the injuries occurred.

This section of the interstate was designed during the mid-1960's by the State Highway Department. The construction contract was let in 1968, and the four-lane interstate was opened to the traveling public in the fall of 1970.

The State contended throughout the trial that the design of the highway and guardrails, or lack of guardrails, was proper. It contended there was a "recovery area" at the place of the gap in the guardrail; that this recovery area was safer than a guardrail; and, that the presence of a guardrail where the gap existed would not have prevented the accident.

Plaintiff's contention was, and his evidence tended to prove, that after this portion of the interstate had been completed, the State noticed that this particular section of the roadway was dangerous when icy; that ice always accumulated during the winter months; that the lack of guardrail permitted vehicles to stray out upon the grassy slope desig-

nated as the "recovery area;" and that vehicles going out upon the recovery area would be unable to stop on the slope and would go into the deep ravine. Further, plaintiff contended that while a guardrail would not have prevented the accident, it would have prevented the injuries received.

The State also contended that as an economic choice in the original design of the highway, and later in maintaining it, the cost of guardrails as compared to the cost of providing a recovery area was a factor in its decision.

A look at the testimony will demonstrate the kind of evidence that was adduced by the State in support of its theory. David S. Johnson was called by the State. He is a professional engineer for the Department of Highways. At the time of trial he was supervisor of engineering specialities for the Department.

Johnson testified:

"Q. Now with regard to the second page of Defendant's Exhibit I, would you look at that page of the document and tell me if you in your review of the design of this highway, and possibily [sic] others, for the State of Montana, would follow the information provided on that document? A. Yes, we would use this.

"Q. Generally what does that information relate to? A. It relates to the providing of clear recovery areas wherever you can on a highway.

"Q. Does it make a distinction in that document with regard to the median as opposed to the shoulder of the road recovery areas? A. Well, I don't see a reference to median in here, just offhand.

"Q. So it would be safe to say that that applies to recovery areas along the shoulders of interstate highways? A. Yes, I think so.

"Q. As a designer, and based upon your education and your experience in that field, is there a preference that you follow with regard to shoulder of the road areas, a preference that you take of recovery area over guardrail? A. Well, it's always better to have a clear space

where a vehicle can recover as opposed to having
a guardrail, which is something that a vehicle
can run into.

"Q.  Do you consider, as a designer, that guard-
rail is a hazard?  A.  Oh, definitely.

"Q.  In your design of interstate highways would
you prefer to have a recovery area built or a
guardrail built?  A.  Well, as a designer, and
as a driver, I would rather have the recovery
area.

"Q.  All right.  On this area of Cottonwood Hill
is there in the design of the interstate highway
a design of recovery area?  A.  Yes, there is."
(Emphasis added.)

Ronald J. Hensen, a consulting engineer from Boulder,

Colorado, also testified for the State:

"Q.  Do you have a term that you use in describ-
ing such an area on the shoulder of the road?
A.  Where they have been dressed down, such as
in this particular area, they are referred to
as a secondary recovery area.

"Q.  Is the use of a secondary recovery area an
accepted practice in protecting a vehicle as it
leaves the traveled way?  A.  Yes, it is.

"Q.  And is that method, the use of a recovery
area, a primary or secondary safety feature
with regard to protection on the shoulders?
A.  Well, it's the primary objective in road-
way design to provide a recovery area wherever
possible, such that a vehicle which inadvertently
leaves the road has an opportunity to get itself
back under control without impacting either an-
other vehicle or a fixed object.

"Q.  Is guardrail used for the protection at the
shoulders of the road when a vehicle leaves the
traveled way?  A.  Guardrail is used in design
as a secondary solution where the physical space
cannot be provided.  That is, where the topogra-
phy is such that to provide additional space out
there would be prohibitive in terms of total
cost.

"Q.  Now, are you suggesting that there are eco-
nomic considerations for the use of recovery
areas, as opposed to guardrail?  A.  Well, there
are economic considerations in the design of
roadways.  And the basic economics of this, there
has to be some trade off between how many miles
of roadway can be improved versus how safe they
can be made.  The ultimate end of it is on one
end you merely provide space for a vehicle to
move, and on the opposite end you make it crash

proof such that no matter what a driver would do he would be protected from himself." (Emphasis added.)

The foregoing evidence demonstrates the posture of the State--that recovery areas were safer than guardrails, more economical, and within the standards. In contrast to that evidence, plaintiff produced an interoffice memorandum dated December 10, 1974, in which the manager of the traffic unit of the Department of Highways reported to the Administrator of the Department in part as follows:

> ". . . We have made an accident analysis run from the H.I.S. System and according to the information obtained, there have been five accidents (plus these two) which have happened in this area in the time period of January 1, 1972 to November 11, 1974. The exact location of these accidents is in the westbound lane, milepost 259.9.

> "This area has a shaded spot which gets very slippery at times in the winter. When vehicles lose control and go into the ditch they are in trouble because they can slide behind the shoulder guardrail and into a hole which is at least 100 feet deep. This situation could very easily be fixed by adding about 600 feet of guardrail which would connect to the guardrail on both ends. There is now a safety project which is under construction in this area and guardrail is bid at $2.75 a foot. Therefore, we feel that this guardrail should be added to the project."

The evidence also showed that eventually the 600 feet of guardrail was installed by the Department, after the Cech accident, at a cost to the state of approximately $145, disregarding the federal contribution.

The State challenges the legal propriety of the verdicts. It directs the Court's attention to evidence supporting its defenses that the design and construction of that portion of the interstate were proper and in accordance with accepted standards, conforming to the state of the art at the time.

At the time of trial, after submission of plaintiff's

pretrial memorandum and his counsel's statements of clarification made during trial, the only issue was whether the State was negligent in not placing guardrails at the edge of the interstate where the accident occurred after the initial construction and before the accident involving the Cech family. Plaintiff's counsel stated, "[t]his case is limited strictly to the subject of guardrails. And we aren't contending there is any engineering defect other than that." During cross-examination, plaintiff's counsel made it clear that he was not alleging or contending that the State failed to warn of icy road conditions or that plaintiff's visibility was in any way interfered with or obstructed at the time of the accident.

At the close of plaintiff's case, the State made a motion for a directed verdict which reads in part:

> "MR. POHLMAN: Comes now the Defendant, and pursuant to Rule 50 of the Montana Rules of Civil Procedure, moves for a directed verdict in favor of the Defendant, upon the grounds and for the reasons that Plaintiff has not by a preponderance of the evidence proved a prime [sic] facie case, in that the Defendant negligently designed the highway in question in its initial design. And further, that the Defendant negligently failed to provide adequate guardrails at the scene in accordance with its initial design of guardrails. And further, that the Plaintiff has not proved a prime [sic] facie case that the Defendant negligently constructed the highway in question in accordance or not in accordance with the design as to the highway, including guardrail and other factors or elements of design and construction. Further, that we want to note to the Court that in Plaintiff's Pre-Trial memorandum Plaintiff has abandoned and withdrawn all initial contentions that the Defendant negligently failed to give warning of hazards, and that Defendant negligently maintained the highway, and in the terms of the Plaintiff's Pre-Trial memorandum, as maintenance pertaining to the usual procedures of sanding, etcetera. The Motion is based upon the record and the testimonial evidence and the exhibits in the Plaintiff's case in chief. Further, that there has been no testimony or other evidence presented by Plaintiff whatsoever showing or proving that there was

negligence in the design of the highway on behalf of the State of Montana. That there was no evidence whatsoever by expert testimony or otherwise that there was a duty or standard of care for the design of the highway as to alignment, slope, grade, guardrail placement, recovery area, signing or any other concepts of design. And further, that there was no evidence presented by Plaintiff that there was any such breach of the said duty or standard of care by the Defendant.

"Further, that there has been no testimony or other evidence presented by Plaintiff proving the Defendant was negligent in failing to provide guardrails subsequent to the original design and construction but prior to the Cech accident of 11-29-74. And further, that there has been no evidence of a duty or a standard of care for the provision and erection of guardrail subsequent to the initial design and construction, but prior to the Cech accident of 11-29-74, and no evidence presented of a breach of any such duty by the Defendant. And further, that there has been no evidence of a standard of care or duty on behalf of the Defendant with regard to accident frequency ratio analysis for this highway in question. And further, that there has been no evidence showing any breach of duty or standard of care for the compilation and reporting of accidents and accident data for this interstate 90 highway."

We note that the first specification of error is directed at the court's failure to direct a verdict on the question of the State's negligence to place a guardrail at the scene of the accident at the time the freeway was first designed and built. The motion did not go to the question of whether the State was negligent in failing to put a guardrail there after there had been accidents in the area. With the uncontroverted expert testimony before it at the time, the court might well have directed a verdict on this very narrow issue. However, the court was not requested to direct a verdict for failing to put a guardrail in after the initial construction and design, so it was not in a position to direct or refuse to direct a verdict on this point. Therefore, we find no error.

The second issue concerns the admission of evidence of subsequent remedial measures taken by the State after the accident. The investigating officer of the Cech accident requested an emergency study of the area which went to the Spot Safety Unit of the Department of Highways. Approximately a month after the accident, after an investigation, a recommendation was made which resulted in the placement of a guardrail across the entrance of the recovery area. This construction was done subsequent to the Cech accident and was completed in 1975.

Over the State's objection, the court allowed evidence of this "subsequent request for an emergency study" to be admitted into evidence. The objection was based on Rule 407, Mont.R.Evid.:

> "When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment."

Plaintiff argues that the admission of other incidents is both relevant and material under the case law of Montana, citing Leonard v. City of Butte (1901), 25 Mont. 410, 65 P. 425, and Robinson v. F. W. Woolworth Co. (1927), 80 Mont. 431, 261 P. 253.

In view of the foregoing testimony, we find no error in the trial court's ruling allowing the offered testimony. In Raybell v. State (1972), 6 Wash.App. 795, 496 P.2d 559, the Washington court found the duty applying to a municipality to maintain adequate protective barriers where such barriers are shown to be practical and feasible. The court commented

that the feasibility of such a guardrail was shown by the fact that the State later installed one in the very location of the accident.

The interdepartmental memorandum quoted above stated that the dangerous situation "could very easily be fixed" by adding about 600 feet of guardrail. This is further proof of feasibility.

Under Rule 407, Mont.R.Evid., the subsequent installation was also admissible for impeachment. The State contended that the so-called recovery area was preferable to guardrail and its experts contended that the absence of a guardrail conformed in every way with acceptable standards so as to refute negligence. They also indicated that economically the recovery areas were preferable to guardrails. In Lawlor v. County of Flathead (1978), ____ Mont. ____, 582 P.2d 751, 35 St.Rep. 884, we found that repair of a chuckhole by the county two days after an accident occurred was admissible to establish feasibility of repair, and to impeach the testimony given by a county road foreman.

The point on which this decision turns should be governed by the appellate rule that the question of admissibility of evidence must in every case be left largely to the sound discretion of the trial court, subject to review only in case of manifest abuse. Gunderson v. Brewster (1970), 154 Mont. 405, 466 P.2d 589.

Affirmed.

_John Conway Harrison_
Justice

-11-

We concur:

_____
Chief Justice

_____

_____

_____
Justices