No. 14629

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

DONNA R. RUNKLE, individually and as
a personal representative,

        Plaintiff and Appellant,

    vs.

BURLINGTON NORTHERN et al.,

        Defendants and Respondents.

---

Appeal from: District Court of the Nineteenth Judicial District,
        Honorable Robert Holter, Judge presiding.

Counsel of Record:

    For Appellant:

        Hoyt, Trieweiler, Lewis & Regnier, Great Falls, Montana
        John Hoyt argued, Great Falls, Montana

    For Respondents:

        Kroschel, Peterson and Koolen, Billings, Montana
        Kent Koolen argued and Gary Peterson argued,
        Billings, Montana

---

        Submitted:  December 11, 1979

        Decided:  JUN 16 1980

Filed: JUN 16 1980

Thomas J. Kearney
                        Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Appeal is by the plaintiff from a judgment entered in the District Court, Nineteenth Judicial District, Lincoln County. For the reasons hereafter stated we reverse and remand for a new trial.

On March 24, 1976 at about 9:00 p.m., a Burlington Northern freight train and a jeep pickup driven by David Runkle collided at the Third Street crossing in Troy, Montana. Third Street is an asphalt roadway running generally in a north-south direction which crosses the Burlington Northern tracks running in an east-west direction. Runkle was driving south to north and the train was proceeding west to east.

The Third Street crossing bisects the town of Troy and is the only way for vehicular traffic to proceed from one side of the town to the other.

At or about the time of the collision, it had been raining in Troy and the plaintiff contends that under the weather conditions the visibility was poor, and because of the placement of buildings, structures, and lights, the crossing was more than ordinarily dangerous. There is a dispute in the evidence as to whether Runkle stopped his vehicle before crossing the railroad tracks, the railroad crew testifying that he did not stop, but others testifying that the railroad crew had stated following the incident that Runkle did in fact stop his vehicle. The crossing was protected by a stop sign and crossbucks; there were no electric gates or warning signals placed there at the time. The train approached the crossing at a "track speed" of 40 miles per hour.

David E. Runkle died as a result of the collision. He is survived by his wife, Donna K. Runkle, and six minor

-2-

children. Donna K. Runkle sued Burlington Northern and one of its employees for damages claimed to have arisen out of his death. The case was tried before a jury which returned answers in its verdict on special interrogatories. The jury found the defendants 31% negligent, and the decedent 69% negligent. The court entered judgment in favor of the defendants and this appeal followed.

We reverse this case principally on the grounds of instructional error and error in refusing certain evidence. In support of the District Court, we point out it was presented with over 150 instructions in this cause, counting amendments; the correlative rights and duties of railroads and automobile drivers passing over railroad crossings has not been clearly enunciated in our statutes or in prior decisions of this Court; and the admissibility of post-accident remedial actions under the new Montana Rules of Evidence has only lately been defined by this Court.

We will expand the recital of facts when necessary to explain the issues.

ON THE ADMISSION OF EVIDENCE

Of the 19 issues raised by plaintiff on appeal, 9 relate to refusal of testimonial or documentary evidence. The court excluded evidence of prior accidents at the same crossing. Appellants sought to introduce such evidence to show that the railroad had notice and knowledge of the hazardous condition of the crossing. Evidence of prior accidents, while inadmissible for the purpose of proving negligence, is nevertheless admissible for the purpose of showing the existence of a danger or defect and notice thereof. Robinson v. F. W. Woolworth Co. (1927), 80 Mont. 431, 261 P. 253; O'Flynn v. City of Butte (1908), 36 Mont. 493, 93 P. 643. Such evidence of prior accidents, however,

-3-

must show situations substantially similar to or not too remote from the accident in question, although absolute identity of circumstances is not necessary. 70 A.L.R.2d 167, 201.

> "One of the principal qualifications of the rule rendering evidence of prior similar accidents admissible for certain purposes is that it must appear, or at least the preliminary proof must tend to show, that the former accidents happened under circumstances substantially the same or similar to those existing at the time of the injury for which suit is brought, and that the instrument or agency which caused the injury was in substantially the same condition at the time such other accidents occurred as it was at the time of the accident in question." 29 Am.Jur.2d Evidence, §305, at 351.

The difficulty here is that from our review of the record, we do not find an offer of proof as to what the prior accidents would have shown. We are unable to determine the question of their admissibility. If the accidents were indeed not similar, the trial court was well within its discretion to exclude such evidence. When the reviewing court cannot ascertain the evidence which is excluded by the granting of a motion in limine, the law is clear there is no reversible error. Hermann v. Merrill Lynch, etc. (1977), 17 Wash.App. 626, 564 P.2d 817.

Likewise, appellants sought to prove the existence of automatic warning signals on other crossings on the railroad in northwestern Montana. This evidence was offered so that appellants could show, by the introduction of such evidence, that crossings which were less dangerous and with less vehicular traffic count were nevertheless equipped with automatic warning devices, while the Troy crossing was not so equipped. The trial court excluded this evidence on the basis of relevance. Here again the discretion of the District Court controls. In Jensen v. Southern Pacific Company (1954), 129 Cal.App.2d 67, 276 P.2d 703, 708, similar

evidence was refused in the District Court and the appellate court upheld, stating that the "[D]etermination of relevancy, including similarity of conditions in such a case, is primarily the function of the trial judge."

However, the District Court denied all evidence of automatic signals that were installed at the Troy crossing after this accident. Appellant sought to introduce such evidence for several purposes, one of which was to impeach witnesses for Burlington Northern who had testified that the crossing was not extra-hazardous.

With respect to subsequent remedial measures, Rule 407, Mont.R.Evid. provides:

> "When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment."

In two recent cases, this Court has held that evidence of subsequent remedial measures offered for impeachment is admissible. Cech v. State of Montana (1979), ___ Mont. ___, 604 P.2d 97, 102, 36 St.Rep. 2185, 2192; and Lawlor v. County of Flathead (1978), ___ Mont. ___, 582 P.2d 751, 35 St.Rep. 884. See also, State v. District Ct. of Fourteenth Jud. Dist. (1977), ___ Mont. ___, 572 P.2d 201, 34 St.Rep. 1447. In Cech, the installation of an additional portion of guardrail after an accident was admitted to counter the state's testimony that a recovery area was preferable to the guardrail and that the absence of the guardrail conformed in every way with acceptable standards. In Lawlor, the repair of a chuckhole by the county two days after the accident was admitted to establish feasibility of repair and to impeach testimony given by a county road foreman.

-5-

In this case, experts testified for the railroad that the crossing was not extra-hazardous. The fact that automatic signals were installed on the crossing after the accident would have been relevant for the purpose of impeachment as well as to show feasibility. It was prejudicial error to exclude this evidence.

A further issue with respect to the admission of evidence revolves around the refusal by the District Court of minutes of the town council of Troy and of letters between the town council and various railroad officials concerning the hazards of the crossing.

Appellants contend that these letters were evidence of the amount and kind of notice that the railroad had respecting the hazardous conditions of the crossing, the need for flashing signals, flagmen, or other safety devices, and were further important in connection with claimed punitive damages to show that the railroad wantonly placed its economic advantage ahead of safety considerations at the crossing.

The railroad, on the other hand, contends that the testimonial evidence otherwise admitted fully showed the jury that the citizens of the town of Troy were concerned about the hazardous condition, that the town council had passed a resolution relating to a speed limit to be imposed on the trains passing through Troy and that appellants' contention that the railroad stopped the imposition of a town speed limit on trains by threatening to take the town to court is an unfair contention.

The District Court had granted a motion in limine to exclude the minutes of the town council as well as the letters because the town had not adopted an ordinance, as distinguished from a resolution, that would have the force and effect of law in imposing a speed limit on trains.

-6-

The record shows that as early as October 1974, the town council had received citizen requests relating to slowing the speed of the train through the town of Troy and the need for other safety devices. Correspondence ensued with the railroad about these matters. The town council passed a resolution, as distinguished from an ordinance, to impose a 25 mile per hour speed limit on the trains. In response, railroad officials met with the town council and offered objections to the speed limits, including the railroad's need to be competitive. The appellant contends that the speed limit was never enforced, nor an ordinance adopted, because of the threat of the railroad to take the matter to court if necessary.

The documentary evidence was relevant to these issues. As such, "[a]ll relevant evidence is admissible. . ." Rule 402, Mont.R.Evid. The minutes of the town council which set forth its "regularly conducted and regularly recorded activities", Rule 803(8), Mont.R.Evid., are admissible as public records and are excepted from the hearsay rule. Letters between the town council and the railroad, and intercorporate memoranda between railroad officials on the subject matter of the crossing were likewise admissible and relevant to show notice of the claimed hazardous conditions, and the intent of the railroad with respect to the same. Of course, letters from the town council or town officials to persons other than railroad personnel (for example, to senators or other elected public officials) would not be admissible unless the railroad personnel participated in the correspondence. The intercorporate memoranda are relevant as possible admissions by a party opponent within the meaning of Rule 801(d)(2), Mont.R.Evid., and the letters are within the business records

exception to the hearsay rule, Rule 803(6), Mont.R.Evid.

The fact that an ordinance was not passed, which would have a binding effect on the railroad, does not prevent the admission of documentary evidence which would establish the resolution of the town council, and how that brought to the notice of the railroad officials the claimed hazardous conditions. These documents go to the issue of ordinary care to be exercised by the railroad and may indeed go to the issue of punitive damages, as an indication of wantonness or oppressiveness.

Whether the railroad had notice of the hazardous condition to the extent that in the exercise of ordinary care it should have moved to reduce or eliminate the hazards, and whether it acted wantonly or oppressively in not so moving, were fact issues which existed independently of the minutes and the council letters. Accordingly, we are not called upon to apply the best evidence rule (See 29 Am.Jur.2d Evidence §449, at 510.) Nonetheless, the documentary evidence here was superior to the testimonial evidence, particularly of those witnesses who would admit only that there was "some concern" or "some discussion" as to the hazardous conditions being brought to the railroad's attention, and the need for a slowdown of the train or additional warning devices.

DUTY OF A RAILROAD REGARDING GRADE CROSSINGS

Before we proceed to the next issues, it is necessary to provide some additional details from the record.

As may be gleaned from the foregoing discussion respecting the town minutes and the intercorporate memoranda, ongoing issues during the trial of this cause related to the duty of the railroad to recognize the Third Street crossing as one requiring more than a crossbuck warning sign; its duty in

regard to the speed of the trains through the crossing, and particularly its duty in the light of the provisions of the Federal-Aid Highway Act of 1973, Pub. L. No. 93-87, 87 Stat. 250; and section 61-8-203, MCA.

Throughout the trial, it was the position of the railroad, that "as a part of United States law" under the Federal-Aid Highway Act of 1973, railroad grade crossing signals are for the benefit of the public and the railroad was not to bear the cost of the installation of such signals. Yet the Federal-Aid Highway Act of 1973, Pub. L. No. 93-87, has no language in it that specifically states that a railroad does not benefit from a grade crossing installation. That Act is an increment to 23 U.S.C. 130, a section which does in fact provide for a determination to be made as to the net benefit to a railroad in connection with railroad crossings. However, the 1973 Act was adopted by Congress for the purpose of entering upon a three year program for the betterment and upgrading of railway grade crossings to improve safety. Monies were supplied to that program, one-third of which were to be used in "off-system crossings" (an off-system crossing was one such as Third Street which was not a part of the federal highway aid system). A subsequent manual published by the federal government indicated that no cost for grade crossing installations was to be recovered from the railroad under the 1973 Act. The impression left in this case by the questioning of the railroad on the effect of the Act required the court to give as an instruction the statement that the Act did not abolish any responsibilities on the part of the railroad concerning its duties to the public at a railroad crossing.

The railroad further contended, however, that under sections 61-8-203, 61-8-706(1), and 61-8-712, MCA, installation

-9-

of crossing signals by the railroad, as a "private corporation," was a misdemeanor and could be declared a public nuisance. That contention arose in this way: Under section 61-8-202, MCA, the State Highway Department was required to adopt a manual and specifications for a uniform system of traffic control devices throughout the state. The manual was prepared by the Department, and it is referred to as the Manual for Uniform Traffic Control Devices (MUTCD). Both sides were contending, erroneously as we shall show, that the manual bespoke the state law on the subject of traffic control devices. The railroad contended on its part that the manual was "the law of the state of Montana" and the guides therein set forth the only legal requirements facing a railroad in this situation. Thus when Douglas Morgan, an employee of the State Highway Department, was under cross-examination, he stated that the responsibility for the installation of traffic signals on railroad crossings rested on local jurisdictions and that local jurisdiction could act only after engineering studies had been carried out. Morgan testified that if the railroad wanted to volunteer to install such traffic control signals, the state government (the Highway Department) would allow it, but that there was no "responsibility or no right placed on the railroad to do it, absent the responsibility of the State of Montana."

For example:

"Q. And now could the railroad do anything more
than merely assist the town of Troy in obtaining
any federal funds that may have become available?
A. In my mind they could.

"Q. Well did they have the legal obligation under
the MUTCD to do anything more than that?

"MR. HOYT: Objection. This is asking this witness
for a legal conclusion. That the MUTCD speaks for
itself.

-10-

"THE COURT: Overruled.

"THE WITNESS: Repeat the question please.

"Q. Do they have a legal obligation pursuant to the MUTCD to do anything more than assist? A. I don't believe so. Not under the MUTCD.

"Q. That is the State law of Montana? A. That has been adopted."

And again later in his cross-examination:

"Q. You have previously testified, have you not, that the responsibility to put signals in rests with either the local authority or with the Montana State Highway Department?

"MR. HOYT: Objection, exceeding the scope of redirect examination.

"THE COURT: It is repetitious. Sustained.

"Q. Mr. Morgan--and you felt this was a crossing-well-if you made the determination that this crossing is a hazardous one and needs signalization, then I would take it you would agree that it would be the state's responsibility to replace signals.

"MR. HOYT: Same objection.

"THE COURT: Overruled.

"WITNESS: It would be the responsibility of the State to attempt to work with the railroad to get signals installed there, right."

Thus the jury was given the impression that it was partly the duty of the State of Montana or the town of Troy to make the Third Street crossing safer by installation of safety devices.

It also developed in the evidence that on July 22, 1975, employees of the State Highway Department met with representatives of the railroad and local authorities, and had then determined that the Third Street crossing was indeed hazardous, and that it required flashing signals and the installation of short-arm gates which would be actuated by any approaching train. The installation of these safety devices may have been awaiting the red tape procedure that inheres in any federal funding project when the fatal accident in this case occurred.

-11-

Section 69-14-602, MCA, makes it the duty of every railroad to construct and maintain "a good and safe crossing" outside of incorporated towns. No similar statute fixes such a duty on the railroad regarding grade crossings within incorporated towns, but most certainly a railroad has a common law duty in the exercise of ordinary care to operate its railroad and to provide such warning devices as reasonable and prudent persons in the same circumstances would operate or provide.

The Federal-Aid Highway Act of 1973 represents an effort by the federal government to improve the safety of grade crossings, and to provide funding for the same. That act does not lessen in any degree the duty, statutory or common law, of a railroad to maintain a good and safe crossing. The Manual on Uniform Traffic Control Devices (MUTCD), promulgated by the Montana Highway Department, may be considered as a standard or norm to be used for traffic control devices. It does not have the force and effect of law in determining the duties and responsibilities of a railroad with respect to the safety of grade crossings. Thus the fact that the Montana Highway Department or the town of Troy had not officially acted to require the railroad to provide traffic control devices other than the crossbucks is not in itself sufficient to absolve the railroad of its common law duty, if it existed, to provide a good and safe crossing. In addition, it was a jury question whether, under the circumstances known to the railroad at and before this accident, the railroad itself should have reduced the speed of its trains over the Third Street crossing. This Court stated these principles in Jarvella v. Northern Pac. Ry. Co. (1935), 101 Mont. 102, 113, 53 P.2d 446, 450, when it said:

"It is noteworthy, in passing, that the mere
fact that no statute exists, or that no order
by an authorized person has been made requiring
gates or other safety devices at crossings, will
not ipso facto relieve the railway company from
the duty of providing safety devices at crossings
sufficiently dangerous to require them."

We considered the status of the Manual on Uniform
Traffic Control Devices in Williams v. Maley (1967), 150
Mont. 261, 267-69, 434 P.2d 398, 401-02. There this Court
said that the manual did not have a status equal to statute.
We also made reference to the fact that it was unlawful for
anyone other than the State Highway Commission to erect
signs on highways. However, neither that case, nor section
61-8-203, MCA, should be read to mean that a railroad in the
exercise of ordinary care may not itself place warning
devices and signs upon its own property or volunteer to
place the same on state roadways upon notification to the
State Highway Department. It would not thereby either
commit a misdemeanor or create a public nuisance.

Thus it may not be enough for the railroad to protect
its crossing with a standard crossbuck, to operate a train
within a speed limit or to blow the whistle and ring the
bell. The jury is still permitted to determine whether the
railroad exercised reasonable care and caution under the
circumstances and conditions existing at the time of the
accident. Whether a railroad is negligent in a particular
manner, such as in failing to provide automatic crossing
gates, oscillating headlights, flasher lights, or in failing
to reduce its speed is a question of fact for the jury.
DeElena v. Southern Pac. Co. (1979), 121 Ariz. 563, 592
P.2d 759, 762; Seaboard Coast Line R. Co. v. Buchman (Fl.App.
1978), 358 So.2d 836, 839-40.

FURTHER TESTIMONIAL EVIDENCE

-13-

We turn now to the contentions respecting three items of testimony to which objections were sustained by the District Court.

Dennis Welch was called. He had been a town councilman at Troy the year before this accident, and as a councilman made a motion at one of the council's meetings to have the Burlington Northern reduce the speed of its trains to 25 miles per hour through town. Welch was also an employee of the Burlington Northern. The plaintiff offered to prove that while Welch was at work following that council meeting he was called on the telephone by an official of the Burlington Northern who stated, according to Welch:

> ". . . I am not sure of his exact words. I do recall he told me 'yes, I see here by your records or by the file that you worked with the railroad since June 4th, 1966 and you have worked for the railroad long enough to know better than to suggest reducing the speed of trains because of the fact that he went on to explain that I believe economic stability of it is costly and so forth.'"

After the conversation with this official, Welch resigned from the town council because, "90% of the reason" was he felt a conflict of interest.

The District Court excluded this evidence. Plaintiffs had raised the issue of wantonness or oppressiveness as the basis for establishing punitive damages. Clearly, if the railroad in fact had utilized its position as employer to exert a form of duress upon its employee, acting in an official capacity, such evidence might have a bearing in the mind of the jury to demonstrate wantonness or oppressiveness sufficient to establish a basis for punitive damages. Section 27-1-221, MCA. This testimony was admissible on the question of the railroad's negligence and on the issue of punitive damages.

Plaintiff also called Bert Winslow, the Troy city judge, who testified that he attended a council meeting in

-14-

January and February of 1975 with other citizens of the town of Troy when Burlington Northern representatives were present including a man named Mr. Mitchell. Plaintiffs offered to prove that Winslow personally requested Mitchell to have the Burlington Northern slow its trains to 25 miles per hour; that Mitchell refused to do so and that his attitude "was very callous" and evidenced a total disregard for the welfare of the people of Troy. The court denied the offer of proof.

The District Court was correct in denying the offer of proof with respect to Winslow for two reasons: Winslow was not acting as an official of the town of Troy at the time he made the request, and Mitchell's attitude may have been personal and not the attitude or a reflection of the position of the railroad with respect to the crossing.

A third witness, whose testimony was denied, was Harry Wasserman, police chief of the town of Troy. If allowed to testify, he would have stated he crossed the Third Street crossing several times daily, that he had been in close proximity to hear any bell sounded on the numerous freight trains as they passed through the crossing during a day; that he had never heard a bell sounded by any freight train as it passed through the crossing. The evidence was offered under Rule 406(b), Mont.R.Evid., on the basis of custom and habit, but refused by the District Court.

We find the court to be correct in this ruling. So many variables enter into the proposed testimony of Wasserman that its probative value as to whether the bell was sounded on the night of the accident is to be doubted. The makes and types of freight engines, the different kinds of bells that might be installed in the various freight engines, the

degree of attention with which the listener may have focused on the sounding of bells as the trains passed the intersection, the different engineers who would have been involved, all make it doubtful that such evidence of habit or custom would indeed reflect that the crew in this case did not sound the bell when their own positive testimony had indicated that they had performed that duty. See 59 A.L.R.2d 1379.

The foregoing relates to items of evidence and testimony that were refused by the District Court. Two other items ruled upon by the District Court are raised as issues and require discussion by us.

The plaintiff presented the testimony of Gerald R. Cysewski, as an expert witness on the subject of design at grade-railway highway crossings. Defense counsel cross-examined the expert through the use of a "Report 50" promulgated by the American Association of State Highway Officials. A caveat in the report indicated that the opinions and conclusions were those of the researcher and not necessarily those of the highway officials. Cysewski testified Report 50 was not authoritative because of errors and contradictions. A witness, Ken Cottingham, who appeared as an expert on defendants' behalf, testified that the report was used extensively in his work and that he personally verified its accuracy.

Plaintiff objected to the use of Report 50 in cross-examination of Cysewski since it was not verified by him as accurate. Defendant contends that under Rule 803(18), Mont. R.Evid., such treatises are permissible for use in cross-examination of an expert, where a treatise is "established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice." Under the rule, the reliability of the treatise, if

-16-

not admitted by the person being cross-examined, may be established by the testimony of another expert, or by judicial notice. This being the case, no error occurred through the court permitting the use of Report 50 for cross-examination of Cysewski.

Plaintiffs called Martin Flom, a visual expert, and offered to prove through him that certain forms of lighting on trains were available to the railroad industry and to Burlington Northern in particular. In that connection, plaintiff endeavored to use through Flom, a treatise entitled, "The Visibility and Audibility of Trains Approaching Highway Grade Crossings", dated May 1971, and promulgated by the Department of Transportation. Again a caveat appeared in this treatise that the contents of the report reflected the opinions of the researchers and that the report did not constitute a standard, specification or regulation. The intent of the plaintiff in the use of the treatise was to establish negligence on the part of the railroad by showing the kinds of lighting equipment available to railroads in the operation of their trains. However this was advisory material only and as such is inadmissible as we held in Hackley v. Waldorf-Hoerner Paper Products Co. (1967), 149 Mont. 286, 294-295, 425 P.2d 712, 716.

We do not by citing Hackley v. Waldorf-Hoerner Paper Products Co., supra, endorse all that is said in that case about codes or standards of safety issued by governmental agencies. Later decisions seem to be moving toward acceptance in evidence of such advisory material with certain qualifications. Such treatises may be admitted upon foundation that they (1) show what is feasible to the jury, or (2) show what the defendant knew or should have known about safety precautions. Charleston Nat. Bank v. International Harvester Co.

-17-

(1974), 22 Ill.App.3d 999, 317 N.E.2d 585. Unless the codes or standards are adopted by a governmental agency so as to have the force of law, they are not to be admitted as conclusively determining the standard of care imposed upon the defendant, Charleston National Bank, supra, nor as substantive evidence of negligence, unless coupled with a showing of general acceptance in the industry concerned. See Lemery v. O'Shea Dennis, Inc. (1972), 112 N.H. 199, 291 A.2d 616. In this case the holding in Hackley v. Waldorf-Hoerner Paper Products Co., supra, applies to Flom's treatise because the necessary preliminary proof is lacking.

We point out that we are not inconsistent in upholding the use of Report 50 and the denial of the Flom treatise. Report 50 was verified as accurate, was being used as authoritative by an expert witness, and was used at trial to test the knowledge of another expert witness in cross-examination. The preliminary proof for its use came within the general rule we have set forth above.

INSTRUCTIONAL ERROR

We find prejudicial error in the giving of the following instructions:

Instruction no. 24:

". . . The court has taken judicial notice that the manual on Uniform Traffic Control Devices is the law in the State of Montana . . ."

Instruction no. 26:

"You are instructed that: section 1A-3 of the Manual on Uniform Traffic Control Devices provides: 'The decision to use a particular device at a particular location should be made on the basis of an engineering study of the location . . .'"

Instruction no. 29:

"You are instructed that: The laws of this State provide as follows:

-18-

"'The Department of Highways and local authorities may designate particularly dangerous highway-grade crossings of railroads and erect stop signs at these crossings. . .'"

Instruction no. 35:

". . . The responsibility for traffic control devices rests on a multitude of governmental jurisdictions."

Instruction no. 36:

". . . It is for you to determine whether the Third Street crossing in Troy, Montana on March 24, 1976, was a rural or an urban crossing."

Instruction no. 37:

". . . If you find from the evidence that a party to this action having a duty to comply with the Manual on Uniform Traffic Control Devices conducted himself in violation of the Manual on Uniform Traffic Control Devices, such conduct was negligent as a matter of law."

Instruction no. 47:

In general, this instruction informed the jury that the members of the crew operating the railroad train had the right to assume the exercise of due care by the other party.

Instruction Nos. 24 and 26: The excerpts from the Manual on Uniform Traffic Control Devices (MUTCD) should not have been submitted to the jury in the form of instructions. They do not have the force of law, are merely advisory, and until the State Highway Commission acts with respect to them, they do not place a duty on any party. See Williams v. Maley, supra. Instead, the jury should have been instructed on the statutory duties of the railroad with respect to operating trains over its crossings, its common law duties with respect to safety in the exercise of ordinary care, and as a correlative matter, the duties of a motorist, both statutory and common law at a railroad crossing. Billings Leasing Co. v. Payne (1978), ___ Mont. ____, 577 P.2d 386, 35 St.Rep. 399. Instruction No. 24 was incorrect as a statement of law, and Instruction No. 26 was useless and confusing.

-19-

In the same way, Instruction No. 29 did not relate either to the duty of the railroad or to the motorist and should not have been given.

Instruction No. 36 was meaningless because the jury was not told what different legal results would depend on whether the crossing was rural or urban. Instruction No. 37, on the duty to comply with the Manual on Uniform Traffic Control Devices, was improper because no formal action was taken to impose a duty under that Manual upon the railroad.

Instruction No. 47, concerning the right of the railroad to assume the ordinary care of a motorist is not applicable unless the party having the right to assume is also exercising ordinary care. The right to assume due care of another springs from the rule that every person who is exercising ordinary care has a right to presume that every other person will perform his duty and obey the law. Tucker v. Lombardo (1956), 47 Cal.2d 457, 303 P.2d 1041, 1047-1048.

THE PUNITIVE DAMAGES ISSUE

The court withdrew the issue of punitive or exemplary damages from the jury. Under the state of evidence in this case, the District Court was not in error, but such may not be the case in a retrial of this cause. We have already adverted to the minutes of the Troy town council, and the intercorporate memoranda, as well as the testimony of Dennis Welch which should have been admitted. The resulting record in a retrial may well present an issue of punitive damages for determination by the jury. Poeppel v. Fisher (1977), _____ Mont. _____, 572 P.2d 912, 34 St.Rep. 1491.

If the evidence on retrial should show that the railroad had either a statutory or common law duty to ameliorate the alleged dangerous circumstance of the Third Street crossing,

-20-

and failed to do so, it would, of course, be acting negligently.
Jarvella v. Northern Pac. Ry. Co., supra.  If in addition,
the railroad took action on its own to avoid such amelioration,
with knowledge of the danger, its conduct would be unjustifiable,
which amounts to malice in law.  Fauver v. Wilkoske (1949),
123 Mont. 228, 211 P.2d 420.  In that situation, a jury may
award punitive damages in addition to actual damages for
sake of example and by way of punishing defendant.  Section
27-1-221, MCA; Ferguson v. Town Pump, Inc. (1978), ___ Mont.
_____, 580 P.2d 915, 35 St.Rep. 824.

AUDIBILITY OF THE WHISTLE AND BELL

Appellants contended throughout the trial that the
whistle and bell were not sounded in advance of the collision,
and that the bell was not audibly effective.  The railroad
employees testified that the whistle was blown from the
whistle post one-quarter mile from the crossing, and the
bell on the locomotive was rung.

We find no case discussing particularly whether the
bell must be audible for the statutory distance.  Section
69-14-562(7), MCA, requires a whistle to be blown and the
bell to be rung within a distance from between 80 rods
(1,320 feet) to 50 rods (825 feet) until the crossing has
been reached.

It seems obvious that the legislative intent is that
such signals be audibly effective to persons on foot or in
vehicles approaching or crossing over the intersection with
the railroad.  We find the legislative purpose to be satisfied
if either the whistle or the bell, both being sounded for
the statutory distance, gives an audible warning to others
using the grade crossing sufficiently effective that a
collision with the train can be avoided in the exercise of
reasonable care.

-21-

## WHETHER THIS JURY SHOULD HAVE FIXED DAMAGES

Appellant contends the jury should have fixed the amount of damages, even though it found the appellant 69% negligent, and the railroad 31% negligent. No error occurred in this case, however. The jury simply followed the instructions given and the form of the special interrogatories. Appellant had approved the form of the special interrogatories.

For the foregoing reasons, the judgment is reversed and the cause remanded for a new trial.

_____
                    Justice

We Concur:

_____
        Chief Justice

_____

_____
        Justices

_____
Hon. Gordon Bennett,
District Court Judge sitting
in for Mr. Justice Daniel J.
Shea

-22-

Mr. Justice John C. Sheehy, specially concurring:

The law in Montana is indeed confusing with respect to the duty of railroads and motorists at railroad grade crossings. Because this case is being returned for retrial, by way of suggestion only, I would submit the following instructions for consideration by the parties and the court. The instructions assume the same record as we now have before us and might not otherwise be applicable; moreover, I offer no guaranty that on a subsequent review my fellow justices would agree. The citations, of course, would not be a part of the instructions when submitted to the jury:

1. The statutory duty of the railroad in this case was to sound its whistle and ring its bell at a point between 80 rods (1,320 feet) and 50 rods (825 feet) from the crossing. It has this duty regardless of whether any person or vehicle is on or approaching the crossing and regardless of the dangerous condition, if any, at the crossing. If you find from a preponderance of the evidence that the railroad did not perform this duty, such failure would be negligence as a matter of law. Section 69-14-562(7), MCA.

2. Implicit in the statutory requirement that the railroad sound its whistle and ring a bell upon approaching a crossing is that such whistle or bell be audibly effective, that is, that one or the other could reasonably be heard by persons on or approaching the crossing on foot or in vehicles. If you find from a preponderance of the evidence that neither the whistle nor the bell were sounded as required by law, or that neither the whistle nor the bell could be heard at the crossing if sounded from a point between 1,320 to 825 feet in advance of the crossing, then again the railroad would be negligent as a matter of law. Section 69-14-562(7), MCA.

-23-

3. The only statutory requirement as to lights on a railroad locomotive is that it must be equipped with a headlight of at least 1,500 candlepower measured without a reflector. If the evidence shows this, or if there is no dispute about it, then this statutory requirement is fulfilled. Section 69-14-236(1)(a), MCA.

4. There is no statutory duty imposed on a railroad to provide oscillating headlights on its locomotives, running lights on the sides of its locomotives, electric warning signals or automatic gates on crossings, flagmen, or other safety means or devices, unless ordered by a public authority authorized by law to do so. In this case there is no evidence of any such order by a public authority. Further there is no statutory limit on the speeds of trains passing through a city or town unless a public authority empowered to do so ordered a speed limit on such trains. None appears here.

5. A breach of a duty imposed by statute or ordinance is called negligence per se, that is, the breach is negligence as a matter of law. A person or corporation can be found negligent however, even if its conduct does not offend a specific statute or ordinance, when the conduct involved does not meet the standard of "ordinary care." Jarvella v. Northern Pacific Ry. Co. (1935), 101 Mont. 102, 53 P.2d 446.

6. Every person or corporation is responsible for injury to the person or property of another caused by want of ordinary care or skill. Negligence means such want of ordinary care or skill. Such want of ordinary care or skill exists when there is a failure to do that which a reasonable and prudent person would ordinarily have done under the circumstances, or doing that which such person under the existing circumstances would not have done. Section 27-1-701, MCA.

-24-

7. Applying the standard of ordinary care to the duty of the railroad in this case therefore, the mere fact that no statute or ordinance exists, or that no order by an authorized person or body has been made requiring certain headlights, warning lights, gates, flagmen, or other safety means or devices at the crossing, will not relieve the railroad from its duty of providing such, at railroad crossings sufficiently dangerous to require them, if reasonable and prudent persons in the exercise of ordinary care would have provided them under the same circumstances. Jarvella v. Northern Pac. Ry. Co., supra.

8. Likewise, if under the same standard of ordinary care, reasonable and prudent persons would have slowed or reduced the speed of the train under the circumstances here, failure to do so would constitute negligence, although no ordinance or statute existed requiring such slowing or reduction of speed.

9. If you find from a preponderance of the evidence that the railroad did not exercise reasonable care under the circumstances, such failure to exercise reasonable care should be considered as negligence.

10. The railroad and its employees are not relieved of their duty to exercise ordinary care because the permission of public officers or other bodies might have been required for the railroad to perform such duty, or that governmental agencies might have a part in funding additional safety devices on highway-railroad crossings. You should consider only in this connection whether the railroad had sufficient notice in advance of this accident of a dangerous condition at the crossing that, in the exercise of ordinary care, it should have moved to reduce or eliminate the dangerous condition.

11. In considering what is the standard of ordinary care to define the duty of the railroad in this case, you

may consider the evidence of the Manual for Uniform Traffic Control Devices (MUTCD) drawn up by the State Highway Department, or manuals of operation drawn up and used by the railroad itself. Whether the railroad conformed to such requirements is relevant and should be considered, but these are not necessarily controlling on the question of whether the railroad and its employees exercised ordinary care, for that question in this case must be determined by you on the basis of such ordinary care as would have been used by reasonable and prudent persons under the circumstances existing here.

12. The driver of an automobile has a duty under Montana law to stop his vehicle at a place between 50 to 15 feet from the nearest rail of the railroad crossing and not to proceed until he can do so safely, but his duty to stop exists only if (1) a train is within 1,500 feet of the crossing, and emitting an audible signal from such distance, and the train because of its speed and nearness is an immediate hazard; or (2) if the train is plainly visible and in hazardous proximity to the crossing. The driver is also statutorily required to drive his automobile at an appropriate reduced speed as he approaches and drives across such crossing. Again, a breach of either of such statutory duties by the driver would be negligence as a matter of law. Sections 61-8-303(5), and 61-8-347, MCA.

13. Apart from such statutory duties, the driver of a motor vehicle can be found negligent if he fails to exercise ordinary care to avoid injury to himself. The term "ordinary care" has the same definition for the driver as for the railroad.

14. The driver of a motor vehicle is required to keep a lookout, not only straight ahead, but laterally ahead. He

-26-

is presumed to see that which he could have seen in the exercise of ordinary care.

15. A railroad crossing is itself a warning of danger to the driver of a vehicle approaching or passing over the crossing. The train, if it is visible in the exercise of ordinary care or if its approach can be detected in the exercise of ordinary care by such driver, is also a warning of danger.

16. In ordinary circumstances, the train has a right of way over its track when a motor vehicle approaches or crosses the railroad crossing which the train is approaching or passing over. If you find that the railroad was not negligent in the operation of its train, it has a right to rely on its right of way. The railroad may not rely solely on its right of way, however, if the train is being operated in violation of statutory duties or in want or ordinary care, and such violation or want of ordinary care is a proximate cause of the collision. Flynn v. Helena Cab and Bus Co. (1933), 94 Mont. 204, 21 P.2d 1105.

17. Both the railroad and the driver have a right to assume that the other party is exercising reasonable care and obeying the law as each approaches and passes over the crossing, but one is entitled to rely on that assumption only if that one is himself or itself exercising ordinary care. Neither party has a duty to anticipate negligence on the part of the other. Tucker v. Lombardo (1956), 47 Cal.2d 457, 303 P.2d 1041, 1047-1048.

John C. Sheehy
_____
Justice

-27-