726 P.2d 706

**Cherie SORIA,**
Plaintiff/Respondent/Cross-Appellant,

v.

**SIERRA PACIFIC AIRLINES, INC., a corporation,**
Defendant/Appellant/Cross-Respondent,

and

**deHavilland of Canada, a corporation; and Western Aircraft Maintenance, a division of Morrison-Knudsen Co., a corporation, Defendants/Respondents,**

and

**Transwestern Airlines, Inc., a corporation; Doe I; Doe II; Doe III and Corporate Does I Through X, Defendants.**

**Bernie RYAN,**
Plaintiff/Respondent/Cross-Appellant,

v.

**SIERRA PACIFIC AIRLINES, INC., a corporation,**
Defendant/Appellant/Cross-Respondent,

and

**deHavilland of Canada, a corporation; and Western Aircraft Maintenance, a division of Morrison-Knudsen Co., a corporation, Defendants/Respondents,**

and

**Transwestern Airlines, Inc., a corporation; Doe I; Doe II; Doe III and Corporate Does I Through X, Defendants.**

Nos. 15817, 15818.

Supreme Court of Idaho.

Aug. 26, 1986.

Rehearing Denied Oct. 28, 1986.

Stephen W. Boller, Hailey, Lloyd J. Webb (argued), of Webb, Burton, Carlson & Pedersen, Twin Falls, and Philip L. Johnson (argued), of Engstrom, Lipscomb & Lack, Los Angeles, Cal. for appellant/cross-respondent Sierra Pacific Airlines, Inc.

Mark S. Geston and Kathleen Perkins Brooks (argued), of Eberle, Berlin, Kading, Turnbow & Gillespie, Chartered, Boise, for

respondent The deHavilland Aircraft of Canada, Ltd.

James J. McCarthy, Los Angeles, Cal. (argued), and Rand Peebles, Ketchum, for respondent/cross-appellant Cherie Soria.

E. Lee Schlender (argued), and Michael F. Donovan, Ketchum, for respondent/cross-appellant Bernie Ryan.

Michael W. Moore, of Imhoff & Lynch, Boise, for respondent Western Aircraft Maintenance.

BISTLINE, Justice.

This case involves the crash of a commercial airplane. The facts—extensive as they are—need to be separated into four categories in order that all six issues on appeal can properly be understood. The four categories are: (1) facts relating to the airplane accident; (2) facts relating to the results of post-accident investigations; (3) facts relating to the plaintiffs' injuries; and (4) facts relating to the trial.

Before discussing the facts under each category, however, a brief description of the multiple parties to this case is in order. The two plaintiffs are Cherie Soria and Bernie Ryan. Soria resides in the Sun Valley area, and Ryan lives in Australia. Both were traveling on business when the crash occurred. Both alleged serious injuries resulting from the crash. They are respondents (and cross-appellants) before this Court.

The defendants include: (1) Sierra Pacific, owner of the airplane which crashed with Soria and Ryan aboard. The jury in this case found Sierra Pacific 100 percent liable for the damages caused; it is the appellant (and cross-respondent) here. (2) deHavilland of Canada, manufacturer of the airplane which crashed, and a respondent here. (3) Western Aircraft Maintenance, which had contracted with Sierra Pacific to maintain and repair its airplanes, and a respondent here. (4) Transwestern Airlines, which had sold the tickets to Soria and Ryan, and which had been leasing and operating the plane owned by Sierra Pacific. It is not a party to this appeal.

**1. The Accident.**

Transwestern Airlines flight no. 868 departed Boise, Idaho, for Hailey, Idaho, on February 15, 1983. Donald Moline was the pilot and Eric Thorsund the co-pilot. Six passengers were on the flight, including Soria and Ryan. The airplane was a Twin Otter aircraft manufactured by deHavilland. Western Aircraft Maintenance routinely maintained and hangared the plane.

The weather was clear and visibility unrestricted. Because of the perfect weather, Moline switched from instrument flight rules to visual flight rules some 30 miles east of Boise.

On take-off, Moline had used the elevator and elevator trim tabs of the airplane to raise the plane's altitude to some 11,500 feet above ground level. Those same elevator devices would later fail Moline when he attempted to land the plane. There is no dispute that this failure occurred.

Approximately 35 miles west of Bellevue, Idaho, Moline commenced the plane's descent using the elevator trim tabs. At 700 feet above ground level, following ordinary procedure, Moline reduced the engine power, allowing the plane's nose to drop down. In order to level the plane Moline attempted to adjust the aircraft's attitude by use of the elevator, but he received no response. The Hailey airport was less than two miles away.

Moline tried the elevator controls again, but still received no response. Trying then to level the plane by use of the elevator trim tabs, he again obtained no response. At this point in time—approximately 300 feet above the ground—the aircraft was rapidly descending downward in a nosefirst attitude. Moline, with only seconds in which to react, increased engine power in an attempt to raise the plane's nose. This tactic partially succeeded; the added engine power raised the plane's nose to an almost level position when it hit the earth. The plane's speed at impact was approximately 140 knots. (This compares to a normal landing speed of 55 knots.)

As the nose came up, Moline aimed it toward a nearby highway where it hit the road and began skidding. The plane skidded some 250 feet before striking a snowbank whereupon it began to cartwheel.

Soria vividly described the terrifying accident as follows:

[SORIA]: I heard the pilot say "fasten your seat belts" very abruptly. And I looked out the window and it appeared to me that we were traveling real fast and we were very close to the ground. And I was really surprised to see how fast we were going and how close to the ground we were, so I checked my seat belt and I saw that it was fastened. And just within the amount of time that I had to do that, it was really seconds, we hit the ground.

. . . .

A. ... [A]s soon as we hit the ground, I knew we were crashing, not landing. It was very obvious because it was an incredible impact.

And it felt to me that we hit on the nose of the plane and possibly over to the right of one wheel of the right side. And as soon as we hit, the impact was so strong it felt—I felt an incredible compression in my back like something just went in my back. It was such a strong impact with the ground.

. . . .

A. And then all of a sudden the plane just started going all over. I was—I felt as though—the only way I can describe it is I felt like I was a rag doll and someone was holding me below the hips and shaking me like this. And people were screaming and there was stuff flying through the air. And I saw what I now know to be Bernie Ryan strapped to his seat and he was bouncing off of the walls. And I thought my mind was playing tricks on me because it looked like he was strapped to his seat so how could he be bouncing off the walls.

There was a lot of things flying through the air. And I was just—I was trying to keep myself relaxed by taking a lot of deep breaths because everyone was screaming, there was panic. And—

Q. The aircraft was still cartwheeling?

A. It seemed to go on forever. It just went on and on. And when it finally came to rest, this man who had been bouncing off the wall was in a heap next to me. He had hit me when he bounced toward me, some part of him hit me, and I was cut here from that, not badly, but I was cut from him. I believe it was from him.

And when the airplane came to rest, I was hanging upside down from my seat belt and I immediately unfastened my seat belt and fell to the floor. And the first thought as I hit the floor, the first thought I had was I smelled gasoline very strongly. My clothes were soaked with gasoline and all I could think of was fire and explosion....

. . . .

A. ... I looked for an emergency exit ... and I couldn't find one. It was very dark in there. And it was very confusing to me because when I boarded the plane, the emergency exit was right on my side, I was sitting right next to the emergency exit, but I couldn't locate it. And that sent more panic through me that I couldn't find a way out.

So I looked toward the front and I saw light coming through the front. For some reason it was very dark in there which I really didn't understand, but it was very dark and light was streaming through the front of the plane where the cockpit had been was quite bright and I saw someone crawling through that space.

I was in a lot of pain at that point and I started dragging myself through the length of the plane.

. . . .

A. So as I crawled through what had become the aisle, and I don't really even know what part of the plane it really was, perhaps the roof of the plane, I had to crawl over someone. No one was moving. I thought everyone was dead.

And I felt terrible that I couldn't stop to help anyone. I felt very guilty. I knew I couldn't help anyone because I could barely help myself.

. . . .

A. So I crawled through the plane and over these people, and I said, "Someone will be here to help you in a minute." And I crawled out through all the wires and bits of metal and everything onto the snow and crawled through the snow. And I kept looking back at the plane to see if I was far enough away that I would be out of the way if it exploded. And I just kept going until I got to the road and then I just collapsed in the snow. R., Vol. 6, pp. 1359–63.

Ryan described the accident in this way:

The rate of descent was still very, very fast. I knew it was far too fast to be a normal landing. And I still was hoping it was all right. . . .

. . . .

Q. Do you recall feeling the impact?

A. Yes, sir. It hit with a great deal of force as I recall what happened, but we hit the ground and the plane—I think I was still in my seat, but the plane was a lot of noise going on, scraping. Could have been wailing. I could have been screaming, I don't know. Just a lot of noise. And it was quite terrifying.

. . . .

A. . . . I thought I was still in my seat, but I can recall slapping around the plane and hitting various parts of the plane. I can recall some time being thrown face down into a bulkhead and I couldn't understand why. I thought I was retained. But all of a sudden I would hit one end of the plane and the next thing I was slamming back into the other. Just like I had no control.

Q. Were you able to grab ahold of anything or stop yourself in any way?

A. No, sir. That was probably one of the most scariest parts. In my racing days and all that, surfing or whatever, skiing, if you are falling, you can somehow retard your descent, retard tum-

bling. But there was no stopping. I had no control.

Q. What do you remember next?

A. I can remember thinking that the next time the plane turns over, and it was going, it just didn't seem to want to stop, the next time it turns over it was going to explode. I hope nobody else ever goes through it, but if you're in an airplane crash, you just think of fire and exploding.

. . . .

A. I just felt that everybody was dead. There was a young boy—when the plane, when I got out of my seat, my seat belt, there was a young boy, I think his mother was in front of me, could have been behind me. But he was the only passenger who sat on the left side of the plane. And when I unbuckled my belt and looked around, I could see I was kneeling in petrol and petrol flowing down the side of the plane.

Q. Fuel, gasoline?

. . . .

A. Yes, sir. And my clothes were soaked in it. And the fumes—I can't recall any noise then, but the young boy, he was crying, calling for his mother. And I think there was two to three women, I am not sure, that were lying totally retained by the belt, but just dead. And I looked at one end of the plane and then back to the other end and there was no way out, it was closed off both ends. And it was just a matter of seconds before it exploded.

. . . .

Q. What happened then? Could you feel anything hurt?

A. Yes, sir. My—I was paralyzed. My legs were numb and my back had so much pain in it, my chest, my knee, just numerous parts of me were so sore.

. . . .

Q. What did you do?

A. I crawled out through the liquid that was on the bottom of the plane, and I crawled out towards the end that showed the light. The back of the plane was completely sealed off. During the

crash when the plane was going through the snow, I seen the pilot sitting there one second and disappearing the next. He was silhouetted against the snow and just disappeared. The cockpit obviously disappeared, but I wasn't thinking that rational at that time. I crawled out on my elbows actually because my knees were very sore and I crawled out held by the other elbow through the debris and all these wires and gauges. R., Vol. 5, pp. 1148–53.

Miraculously, no one was killed, although all the people aboard the plane suffered severe injuries.

## 2. The Post-Accident Investigations.

Officials of the National Transportation and Safety Board ("the Board")—responsible for investigating airplane crashes—arrived the day after the crash, February 16, 1983, to investigate. Representatives of Sierra Pacific, deHavilland, and Western Aircraft Maintenance joined the Board, at its request, to provide technical assistance for the investigation.

The Board investigated all aspects of the accident. Attention ultimately turned to the malfunctioning elevator and elevator trim tabs, located in the tail of the plane. The investigators discovered that a bolt, nut, and cotter pin, which were supposed to be connecting the elevator devices to the pilot's connecting rod, were missing. The investigators knew that the bolt, nut, and cotter pin had not been torn away or dislodged as a result of impact, because there was no deformation of the bolt hole or in the connecting rod.

Despite the crash, the tail section of the plane remained intact. Thus, one investigator—searching for the missing nut, bolt, and cotter pin—found one single bolt at the bottom of the tail. No cotter pin or nut were ever found. Metallurgical and ultrasound testing, and microscopic examination of the bolt, conducted by the Board, showed that it had been *the bolt* connecting the pilot's connecting rod with the elevator devices at least from the time when the plane was repainted in 1981. The test re-

sults also showed that *no* nut or cotter pin had ever been used to secure the bolt, and that the bolt had worked its way out over time, holding the connecting rod to the elevator devices merely by tension.

Further examination of the bolt showed that it was far shorter and of less strength than the type of bolt deHavilland specifies in its parts catalogue manuals. The bolt was so short, in fact, that it could not have been properly secured with a cotter pin and nut had there ever been an attempt to do so. Markings on the outboard side of the connecting rod also showed that the bolt had been inserted with its face *outward.* This contravenes deHavilland specifications, which state that the head of the bolt should face *inward.* The reason for this distinction is that, structurally, proper installation of the bolt, nut, and cotter pin is virtually impossible when the head of the bolt faces *outward;* there is very little room behind the connecting rod in which the nut and cotter pin can be attached. Furthermore, inspection of the nut and cotter pin would be more difficult if the head of the bolt were facing outward, because a mechanic would have to use mirrors or his hand to see if the nut and cotter pin were properly secured.

The Board's metallurgical evidence and investigation substantiated the physical evidence discovered at the accident scene. The evidence explains why pilot Moline lost elevator control during flight: the bolt found in the bottom of the tail section had not been properly secured, and had worked its way out over time, finally falling out during the final landing approach on February 15, 1983. The question of how this could have occurred was also investigated by the Board.

In December 1981, Sierra Pacific repainted the plane which crashed in this case. This required, in part, a Sierra Pacific mechanic to remove the elevators for repainting. During the repainting, Sierra Pacific mechanics also disassembled and inspected the various elevator devices and connecting rods.

Reinstallation of flight controls is a required inspection item. Federal Aviation Administration rules require one mechanic to perform the installation, another independently to inspect the installation, and both to sign what is known as an "M–6" work order form. This form allows investigators to accurately trace the plane's maintenance history. Thus, pursuant to FAA rules, the first Sierra Pacific mechanic should have secured the connecting rod to the elevator devices with a properly specified bolt, castellated nut, and cotter pin. A second mechanic should then have looked at this connection to ensure that it was secure. Both individuals should also have signed the M–6 form showing that they had performed their required duties.

When the Board examined Sierra Pacific's M–6 forms, they found forms showing disassembly of the plane's flight controls and inspection of those parts. The M–6 form showing reassembly and inspection of those flight controls *was never found.* Sierra Pacific has *never* offered an explanation for this gap in its records—a shockingly large and illegal gap.

At the time Sierra Pacific was repainting and doing the maintenance work on the plane in issue here, it also was having the exact work done on two other identical planes. The Board found M–6 forms showing reinstallation of flight controls on these two other planes. This makes the absence of the M–6 form detailing flight control reassembly on the defective plane even more suspect.

There is an M–6 form which does show that a reinspection of the instant aircraft's connecting rod and elevator devices was performed on November 5, 1982. Two Sierra Pacific employees signed the M–6 form indicating that they inspected the various connections and devices. The fact is,

however, that had the inspection been properly conducted, the improper bolt and lack of a nut and cotter pin *would have been discovered.* This was testified to at trial by several mechanics.[1] Accordingly, the jury could have concluded that Sierra Pacific employees either lied about their performing these required inspections, or did the inspection in a grossly negligent way, callously and shockingly permitting the unfastened bolt to continue to hold the elevator control devices together by mere tension.

### 3. Plaintiffs' Injuries.

#### (a) *Bernie Ryan.*

Australian Bernie Ryan was 31 years old when the accident occurred. Ryan was an excellent athlete, participating in several sports, including football, diving, swimming, and motorcycle racing. In fact, he once represented Australia in international motorcycle racing. Ryan worked for an Australian sports equipment import firm as a sales and sports representative.

Since the accident, Ryan testified that he is unable to engage in any of his vocational or sporting hobbies. He also alleges that he now has a fear of flying so intense that, unless heavily sedated, he is unable to do so. This, Ryan contends, has further damaged his career, because the job he held when he was hurt required extensive air travel.

Doctors who examined Ryan testified that in the accident he suffered a broken rib, fractured vertebrae, ligament and nerve damage, and bleeding. The ligaments in Ryan's left knee were severely ruptured.[2] Nerve damage has caused numbness in his leg and groin area. We have previously quoted Ryan's terrifying

---

1. It is *essential* to remember that results of the Board's metallurgical, ultrasound, and microscopic testing showed that the unfastened and improperly sized bolt was *the bolt* used immediately upon completion of the repainting of the plane in issue in December 1981. It is also necessary to note that no party, including Sierra Pacific, has ever alleged that the flight controls were disassembled at any other time by any other party prior to the accident.

2. Prior to the accident, Ryan had undergone surgery on his knee to repair prior ligament damage. Doctors testified that the injuries to Ryan's knee from the accident would make rehabilitation to his knee more difficult than had the accident not occurred.

experience in the crash. That experience, which in addition to the physical pain inflicted, has also caused psychological harm.

One psychiatrist, Dr. Holt, diagnosed Ryan as suffering from a post-traumatic stress disorder. His conclusions were based, in part, on reoccurring nightmares of the accident which Ryan has experienced. Dr. Holt recommended psychiatric treatment, but stated that there was no guarantee that such treatment would benefit Ryan. Dr. Holt also stated that it would take a great amount of effort on Ryan's part in order for any treatment to be successful.

In closing argument, counsel for Sierra Pacific admitted at least partial liability[3] and suggested that $75,000 would be just compensation for Ryan's damages. *See* R., Vol. 11, pp. 2812–13. As discussed in more detail below, the jury awarded Ryan $500,-000 damages.

### (b) *Cherie Soria.*

Cherie Soria was 35 years old when the accident occurred. Before her accident, Soria's favorite hobby was karate; she was a blackbelt, and in the year prior to the accident, Soria had earned $1,727 as a karate instructor. Because of her injuries, Soria testified that she is unable to engage in or teach karate today.

Before her accident, Soria managed a beauty salon, doing at least 12 haircuts a day. Her 1982 tax return shows that Soria earned over $35,000 at the salon. She testified that she now is unable to work at the salon because of pain caused by the injuries received in the accident.

In connection with her hairstyling work, Soria also conducted platform hairstyling demonstrations. She earned over $7,400 in 1982 for these demonstrations. These shows required that Soria stand and style for up to 12 hours a day, which, because of the nature of her injuries, she testified she is now unable to do. Soria also claims that the injuries she received preclude her from

engaging in other hobbies, including tennis, skiing, dancing, hiking, and yoga.

Doctors testified that Soria's injuries included the following: a broken pelvis in two places, a sprained back, a mild concussion, a hip puncture wound, a damaged knee, and intermittent headaches and dizziness. Soria's treating physician, Dr. Barbee, testified that Soria's pain and physical injuries at the time of trial still precluded Soria from engaging in karate and doing hairstyling and platform presentations. Dr. Barbee also reported that because of the frightening nature of the accident, Soria suffered from severe post-traumatic anxiety attacks when confronted with situations that paralleled her accident. Such situations included being in closed spaces, smelling gasoline fumes, or being in a crowd of people.

Counsel for Sierra Pacific, as with Ryan, conceded at closing argument at least partial liability for Soria's injuries, and stated that just compensation for those injuries would be $250,000. R., Vol. 11, pp. 2812–13. The jury awarded Soria $1,000,000 damages.

### 4. The Trial Proceedings.

On March 15, 1983, Ryan filed suit against the named defendants. Soria filed her suit on December 13, 1983, later amending her complaint twice. Sierra Pacific answered both complaints and cross-claimed against deHavilland. Transwestern answered both complaints and cross-claimed against Western Aircraft, Sierra Pacific, and deHavilland. The cases were later consolidated.

The case went to trial on September 17, 1984, and continued, with some recesses, through October 15, 1984. On that date, the jury returned its special verdict finding Sierra Pacific negligent, which negligence was the proximate cause of the plaintiffs' injuries. The jury found Sierra Pacific 100 percent negligent and assessed damages as follows: for Soria, $1,000,000; for Ryan,

---

**3.** Counsel would only admit to 40 percent of the fault, arguing that deHavilland was also 40 percent liable and Western Aircraft Maintenance 20 percent liable.

$500,000; and as punitive damages, $750,-000.

On October 29, 1984, Sierra Pacific filed a motion for a new trial, arguing that the plaintiffs' damages were excessive, punitive damages were improper, and an agreement between the plaintiffs and deHavilland and Western Aircraft Maintenance, which is discussed below, should have been disclosed to the jury. The district court denied the motion and Sierra Pacific appeals to this Court. Both plaintiffs have also appealed the district court's decision not to award them attorneys' fees.

The agreement referred to above was entered into by attorneys for the plaintiffs, deHavilland, and Western Aircraft Maintenance during the *voir dire* stage of the trial. The agreement was concluded before opening statements were given. In short, the agreement called for the following: deHavilland and Western Aircraft Maintenance agreed not to contest plaintiffs' damage case against Sierra Pacific and Transwestern. In return, plaintiffs agreed to dismiss with prejudice their claims against deHavilland and Western Aircraft Maintenance. The plaintiffs also agreed to renounce any right to whatever proportion of total damages the jury might attribute to the two defendants. The two defendants would still have to defend against the cross-claims of Sierra Pacific and Transwestern.

Shortly after the agreement was reached, the district court and attorneys for the non-agreeing defendants were notified of its contents. Sierra Pacific requested that the agreement's contents be disclosed to the jury. The district court refused to do so.

As mentioned above, both plaintiffs and Sierra Pacific have appealed. Sierra Pacific lists 13 issues, which, for purposes of this appeal, can be reduced to five. Plaintiffs also have raised one issue. Sierra Pacific's appeal will be discussed first, and then plaintiffs' cross-appeal will be discussed. The five issues raised by Sierra Pacific are: (1) Did the district court err in refusing to grant Sierra Pacific's request

to disclose the above-mentioned agreement to the jury? (2) Were the damage awards in favor of Ryan and Soria excessive? (3) Was the award of punitive damages improper or excessive? (4) Did various evidentiary rulings by the district court improperly prejudice Sierra Pacific? and (5) Did the district court err in awarding costs to deHavilland and Western Aircraft Maintenance? The plaintiffs each question whether the district court abused its discretion in refusing to grant them their attorneys' fees below. We remand in part on issues two and three, and we affirm the district court on all other issues.

I. THE DISTRICT COURT DID NOT ERR IN REFUSING TO GRANT SIERRA PACIFIC'S REQUEST TO DISCLOSE THE ABOVE-MENTIONED AGREEMENT TO THE JURY.

Sierra Pacific's first argument is that the district court abused its discretion in denying its motion to inform the jury of the contents of the agreement between the plaintiffs and deHavilland and Western Aircraft Maintenance. We are not persuaded.

Sierra Pacific argues that the agreement discussed above is a "Mary Carter" agreement and, according to case law on this point, should have been disclosed. Our review of the case law and commentaries convinces us that the agreement in this case is *not* a "Mary Carter" Agreement. Furthermore, we hold that Sierra Pacific has failed to show any specific prejudice as a result of the district court's decision which would justify our reversing the district court.

A. *Mary Carter Agreements Defined.*

The term "Mary Carter" Agreement was coined by the Florida Court of Appeals in *Maule Industries, Inc. v. Rountree*, 264 So.2d 445, 446 N. 1 (Fla.App.1972), *reversed on other grounds*, 284 So.2d 389 (Fla.1973). It arose from an agreement popularized in *Booth v. Mary Carter Paint Co.*, 202 So.2d 8 (Fla.App.1967). Today the term "Mary Carter" agreement generally

has come to be understood as constituting three parts: First, the agreeing defendant promises to remain a party to the plaintiff's action until a verdict has been reached or it has been released by the trial court or plaintiff. Second, the agreeing parties promise to keep the whole agreement secret. Third, and most important, the agreeing defendant guarantees a certain recovery for the plaintiff. In return, the agreeing defendant's liability is decreased in direct proportion to the increase in the nonagreeing defendant's liability. *Vermont Union School Dist. No. 21 v. H.P. Cummings Construction Co.*, 143 Vt. 416, 469 A.2d 742, 748–49 (1983); *Cox v. Kelsey-Hayes Co.*, 594 P.2d 354, 357 (Okl. 1979); Comment, *Mary Carter Agreements: Unfair and Unnecessary*, 32 Sw. L.J. 779, 782–83 (1978); Comment, *The Mary Carter Agreement—Solving the Problems of Collusive Settlements in Joint Tort Actions*, 47 S.Cal.L.Rev. 1393, 1396–97 (1974).[4]

The importance in determining whether or not an agreement is a "Mary Carter" agreement is that the weight of case law does require such agreements to be disclosed to the jury. *See, e.g., Mustang Equipment, Inc. v. Welch*, 115 Ariz. 206, 564 P.2d 895, 899 (1977); *Rountree, supra,* 284 So.2d at 390; *Ward v. Ochoa*, 284 So.2d 385, 387 (Fla.1973).[5] The reason for requiring disclosure of such agreements is manifest: the normal adversarial relationship between the plaintiff and defendants is distorted, if not destroyed, in instances where a purported defendant has an incentive to increase plaintiff's damages.[6] Such distortion and incentive have the distinct potential for misleading jurors in reviewing evidence and judging witness credibility. *Cox, supra,* 594 P.2d at 357–58. We need not decide, however, whether "Mary Carter" agreements are valid in Idaho, or, if they are, what requirements attach to them with respect to disclosure, because we are convinced that the agreement here is not a "Mary Carter" agreement.

### B. The Agreement Here Is Not a Mary Carter Agreement.

The crucial aspect that distinguishes "Mary Carter" agreements from other agreements is the inclusion of some sort of *financial guarantee clause.* State ex rel. *Vapor Corp. v. Narick,* 320 S.E.2d 345, 349 (W.Va.1984); *Vermont Union, supra,* 469 A.2d at 748; *Cox, supra,* 594 P.2d at 357; *Mary Carter Agreements, supra,* 32 Sw.L.J. at 783. The fact that there was no financial guarantee or built-in incentive on the agreeing defendants' parts to increase plaintiffs' damages in the agreement in our case refutes any argument that it is a "Mary Carter" agreement. Hence, case law requiring disclosure is nonapplicable, because those cases deal only with "Mary Carter" agreements.

As mentioned above, the agreement between the plaintiffs and defendants deHa-

---

**4.** Part of the agreement in the original *Mary Carter* case contained the following elements: (1) the plaintiff agreed not to execute a judgment against the settling defendant in exchange for the settling defendant's continued presence in the trial; (2) the plaintiff was guaranteed $12,500 by the settling defendant if a take nothing judgment was entered; (3) if a judgment was entered against all defendants for less than $37,500, the settling defendant was to pay the difference up to $12,500; and (4) the agreement was to remain secret. *Booth, supra,* 202 So.2d at 10.

**5.** Some jurisdictions have held that "Mary Carter" agreements are void as against public policy. *See, e.g., Lum v. Stinnett,* 87 Nev. 402, 488 P.2d 347, 351 (1971); *Trampe v. Wisconsin Telephone Co.,* 214 Wis. 210, 252 N.W. 675, 677–78 (1934).

**6.** The incentive to increase a plaintiff's damage award occurs when the defendant in the agreement guarantees a minimum sum to the plaintiff, which will *only* be paid by the agreeing defendant if the overall damage award collectible against the nonagreeing defendant is less than the agreed-upon minimum award. In such cases, the defendant who is a party to the agreement with the plaintiff will want plaintiff's overall damages against the nonagreeing defendant high enough so that he or she will not be required to pay anything. Thus arises the incentive on the agreeing defendant's part to work on behalf of the plaintiff and increase his or her damage award.

villand and Western Aircraft Maintenance called for the following: the agreeing defendants would not contest plaintiffs' damage case against Sierra Pacific and Transwestern. In return, the plaintiffs would dismiss their claims against both deHavilland and Western Aircraft Maintenance. At no time, however, did any defendant promise the plaintiffs a guaranteed sum, and in no way can it be argued that the agreeing defendants had any incentive or actually sought to *increase* the amount of plaintiffs' damages. Thus, not only is case law requiring disclosure inapplicable, but also the reasons mentioned above which argue for requiring disclosure are not on point.

■ Where the agreement in a case does not guarantee a plaintiff a certain sum, or create an incentive on an agreeing defendant's part to increase the plaintiff's damage award, there is no reason to require *in all circumstances* the disclosure of such an agreement to the jury, and we so hold.

C. *There Was No Prejudicial Error in The Trial Court's Refusing to Require that the Contents of the Agreement in This Case Be Disclosed.*

■ In cases where there is an agreement between a plaintiff and one of the defendants relating to trial procedures, which does not include a guarantee to the plaintiff of a minimum sum, or create an incentive on the agreeing defendant's part to increase plaintiff's damage award, we hold that the decision whether such an agreement will or will not be disclosed shall be committed to the broad discretion of the trial court. The trial court shall make this determination in accordance with the rules governing the admissibility of evidence involving compromises, offers to compromise, and relevancy.

Rule 408 of the Idaho Rules of Evidence states:

**Compromise and offers to compromise.**—Evidence of (1) furnishing, offering, or promising to furnish, or (2) accepting, offering, or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed, as to either validity or amount, is not admissible *to prove liability for, invalidity of, or amount of the claim or any other claim.* Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule does not require exclusion if the evidence if offered for another purpose, such as *proving bias or prejudice of a witness*, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.[7] (Emphasis added.)

It is readily apparent that Rule 408 does *not* require exclusion of evidence relating to compromises or offers to compromise if the evidence being introduced is used to show witness bias or prejudice. *Accord. Branch v. Fidelity & Casualty Co. of New York*, 783 F.2d 1289, 1294 (5th Cir.1986) (settlement agreement is not admissible to prove liability, but whether to permit the evidence for another purpose is within the discretion of the trial court); *McInnis v. A.M.F., Inc.*, 765 F.2d 240, 248 (1st Cir. 1985) (although Rule 408 bars the admission of evidence of settlement to prove liability or the validity of a claim, it expressly allows such evidence offered for other purposes); *Brocklesby v. United States*, 767 F.2d 1288 (9th Cir.1985); *Parker v. O'Rion Industries, Inc.*, 769 F.2d 647 (10th Cir.1985); *Belton v. Fibreboard Corp.*, 724 F.2d 500, 505 (5th Cir.1984)

---

7. Although the adoption of Idaho's Rules of Evidence was not effective until July 1, 1985, after the trial in this case, Rule 408 had previously been approved by this Court. In *Hatfield v. Max Rouse & Sons Northwest,* 100 Idaho 840, 846, 606 P.2d 944, 950 (1980), this Court adopted Rule 408 by quoting the federal rule and holding that statements made in the course of settlement negotiations are not admissible to prove liability or the invalidity of a claim or its amount, as Rule 408 provides.

(Rule 408 by its terms does not operate to exclude evidence unless it is offered to prove liability or invalidity of claim, and whether to admit evidence for another purpose is within the discretion of the trial court); *Reichenbach v. Smith,* 528 F.2d 1072 (5th Cir.1976).

■ As mentioned above, the decision of whether to admit such evidence for another purpose is committed to the discretion of the trial court. *Branch, supra,* 783 F.2d at 1294; *Belton, supra,* 724 F.2d at 505; *Reichenbach, supra,* 528 F.2d at 1074; *Stancill v. McKenzie Tank Lines, Inc.,* 497 F.2d 529, 535 (5th Cir.1974).[8] Whether the evidence is admissible shall be determined by rules concerning relevancy and possible outweighing prejudice.

Many courts have stated that the decision of whether to admit such evidence will not be reversed unless the trial court abuses its discretion and such abuse amounted to "manifest error." *Belton, supra,* 724 F.2d at 505; *Reichenbach, supra,* 528 F.2d at 1074; *Lee v. Savage,* 38 Wash.App. 699, 689 P.2d 404, 410 (1984); *Cech v. State,* 184 Mont. 522, 604 P.2d 97, 102 (1979). Other courts have held that a trial court's decision about the admissibility of such evidence will only be reversed where it is shown that the evidence was (1) erroneously admitted or excluded, and (2) had a "substantial influence in bringing about the verdict." *Bambrough v. Bethers,* 552 P.2d 1286, 1290 (Utah 1976). Idaho law is in accord with the latter rule. *Rowett v. Kelly Canyon Ski Hill, Inc.,* 102 Idaho 708, 711, 639 P.2d 6, 9 (1981).

■ Idaho grants trial judges *"broad discretion* as to the admission of evidence and the exercise of that discretion will not

be overturned absent the *clear showing* of abuse." *Cheney v. Palos Verdes Investment Corp.,* 104 Idaho 897, 900, 665 P.2d 661, 664 (1983). (Citations omitted) (emphasis added). Trial judges also are granted *broad discretion* in determining relevancy. *Marks v. Vehlow,* 105 Idaho 560, 569 n. 9, 671 P.2d 473, 482 n. 9 (1983). *Accord. Southern Pacific Transportation Company v. Fitgerald,* 94 Nev. 241, 577 P.2d 1234, 1235 (1978); *Holmquist v. D-V, Inc.,* 1 Kan.App.2d 291, 563 P.2d 1112, 1117 (1977); *City of Phoenix v. Boggs,* 1 Ariz.App. 370, 403 P.2d 305, 308 (1965). Our review here, however, need not center around whether the trial court abused its broad discretion in refusing to disclose contents of the agreement to the jury, because we hold that, even if the trial court did err, there was no prejudice resulting from the district court's decision which would warrant reversal. Rule 61, I.R.C.P., states the following:

> **Rule 61. Harmless error.—***No error in either the admission or exclusion of evidence* and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is *ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice.* The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties. (Emphasis added).

Applying this standard, we hold that the trial court's decision, even if erroneous, was harmless.

---

**8.** The reason for committing this decision to the sound discretion of the trial court derives from the trial court's ability to observe the multitude of factors surrounding such agreements. We find the Arizona Court of Appeals' reasoning on this point to be persuasive:

> [A] trial court is in a unique position to view the factors surrounding such an agreement and to decide, when requested, whether such an agreement should be admitted. The record in this case reflects the wisdom of such a holding. The trial court was aware of all

the adverse possibilities inherent in the existence of the agreement and was fully prepared to impose sanctions, if necessary, to prevent injustice, up to and including admitting the agreement into evidence. *After observing the conduct of all counsel, their demeanor, their witnesses, and the overall atmosphere of the courtroom, the trial judge determined it unnecessary in this case to disclose the agreement to the jury. Sequoia Manufacturing Co., Inc. v. Halec Construction Co., Inc.,* 117 Ariz. 11, 570 P.2d 782, 795 (1977) (emphasis added).

Sierra Pacific claims that it needed the contents of the agreement disclosed to the jury to show that witnesses for the defendants who were parties to the agreement compromised their testimony. We disagree. Depositions of the witnesses whom Sierra Pacific claims testified in a compromisingly fashion were taken long before the instant agreement was entered into.[9] *Sierra Pacific had full access to these depositions and could have used them to impeach any witness it felt was compromising his or her testimony to show bias or prejudice.* Thus, it is clear, contrary to the dissent's assertions, that Sierra Pacific did not need to introduce the contents of the agreement in order to show witness bias or prejudice.

Additionally, there is no appreciable evidence to suggest that the refusal to disclose the agreement impermissibly prejudiced Sierra Pacific or denied it substantial justice. The record fails to show that deHavilland or Western Aircraft Maintenance abandoned defenses unavailable to Sierra Pacific. The only change in conduct was the defendants' refusal to contest plaintiffs' witnesses on damages. *Sierra Pacific had full opportunity to cross-examine these witnesses,* which it did vigorously and competently. *The defendants' withdrawal did not materially alter that opportunity, nor make plaintiffs' damage case any easier.*

Neither deHavilland nor Western Aircraft Maintenance admitted their liability.[10] Both before and after the agreement, the two argued that they were not responsible for the harm caused, and that Sierra Pacific was responsible. This was more than reasonable in light of the evidence produced at trial and the cross-claims of Sierra Pacific and Transwestern to which deHavilland and Western Aircraft were responding. *The adversarial relationship between the defendants was clear with or without the agreement.*

Neither deHavilland nor Western Aircraft Maintenance ever stipulated to any amount of damages, whether special or general.[11] They left the proof of damages to the plaintiffs. *Nothing in the record indicates that the agreement led to an inflation of damages.*

Finally, as noted above, Sierra Pacific has failed to show how either deHavilland or Western Aircraft Maintenance led witnesses in a manner which impermissibly prejudiced it. The testimony of the witnesses about which Sierra Pacific complains included that of individual representatives from the various defendants to the suit. Their testimony, Sierra Pacific argues, prejudiced them, because they pointed to liability on Sierra Pacific's part. Sierra Pacific misses the point in its argument.

The mere fact that a given defendant's testimony in a multi-defendant case benefits the plaintiff does not, in and of itself, show impermissible prejudice. The key is whether the purported defendant's testimony also *damaged its own ostensible interests.* The reason for this distinction is obvious. In many cases involving multi-defendants, the testimony of one defendant will point to the liability of another. This is especially true where the several defendants have cross-claims against each other. This is neither extraordinary nor impermissible.

In our case, Sierra Pacific does not point to one instance where witnesses representing deHavilland or Western Aircraft Maintenance testified to any degree against their *own* interests. Never did they concede liability. Never did they testify in support of the plaintiffs' damage case. *In short, it is clear from the record that the contents of the agreement did not change the witnesses' testimony nor impermissi-*

---

9. Counsel for Western Aircraft Maintenance informed the trial judge that the agreement was entered into during *voir dire.* R., Vol. 2, p. 145.

10. It should be remembered that Sierra Pacific was willing to admit at least partial liability for Soria's and Ryan's damages.

11. It should be remembered that Sierra Pacific was willing to concede that Ryan's damages were $75,000 and Soria's $250,000.

*bly prejudice Sierra Pacific on its claim that witnesses of the agreeing defendants were biased or prejudiced.*

The last thing Sierra Pacific alleges as being impermissibly prejudicial to their case is the fact that during plaintiffs' damage cases, the agreeing defendants remained silent and did not challenge the plaintiffs' witnesses. This, Sierra Pacific contends, confused jurors with respect to the alignment of the parties. The record, however, does not support this contention.[12]

Sierra Pacific's argument that mere silence on the part of deHavilland Western Aircraft Maintenance during just one aspect of the trial led the jurors into reaching impermissible conclusions concerning Sierra Pacific's liability and the damages of the plaintiffs' stretches credulity. The reason for this is that the facts of this case are clear and forceful: *The reason the jury found Sierra Pacific 100% liable is that it alone was responsible for the crash when its mechanics failed to reinstall and inspect the airplane's elevation system.* Counsel for Sierra Pacific knew that, and no doubt admitted liability in his closing argument because of it.

The record in this case speaks for itself. We are convinced that Sierra Pacific has "not adequately demonstrated that had the [agreement's contents] been introduced at trial, a different result would have been probable." *Rowett, supra,* 102 Idaho at 711, 639 P.2d at 9.[13] *Accord. Bambrough, supra,* 552 P.2d at 1290. Even if

there were error, it did not involve substantial justice and was not of the type that had a "substantial influence in bringing about the verdict." *Bambrough, supra,* 552 P.2d at 1290. Hence, we affirm the district court on this issue.

## II. THE RECORD DOES NOT REVEAL WHETHER THE DISTRICT COURT APPLIED CORRECT STANDARDS OF REVIEW ON SIERRA PACIFIC'S MOTION FOR NEW TRIAL

Sierra Pacific filed a motion for a new trial, arguing, in part, that the damages awarded the plaintiffs are excessive. The district court summarily denied this motion.

■ The seminal case on the function of a trial judge when faced with a motion for a new trial based upon either excessive or inadequate damages is *Dinneen v. Finch,* 100 Idaho 620, 603 P.2d 575 (1979). In deciding a motion for new trial premised upon an allegation of either excessive or inadequate damages, the trial court *must* weigh the evidence and determine if the verdict was awarded under the influence of passion or prejudice. *Dinneen, supra,* 100 Idaho at 625, 603 P.2d at 580 ("Where a motion for new trial is premised on inadequate or excessive damages, the trial court *must* weigh the evidence...." (Emphasis original.)) On appeal, this Court's standard of review is whether the district court abused its discretion in deciding as it did. *Black v. Reynolds,* 109 Idaho 277, 280, 707 P.2d 388, 391 (1985); *McLean v. City of Spirit Lake,* 91 Idaho 779, 784, 430 P.2d

---

**12.** Sierra Pacific fails to note that counsel for Transwestern also did not challenge many of the plaintiffs' damage witnesses, even though Transwestern was *not* a party to the agreement.

**13.** *Rowett* dealt with the standard of review for determining whether enlargments of two photographs which were admitted into evidence at trial justified the ordering of a new trial. The court held that the enlargements did not qualify as newly discovered evidence which would warrant a grant of a new trial pursuant to Rule 59(a)(4), I.R.C.P. *Rowett, supra,* 102 Idaho at 711, 639 P.2d at 9. It is clear then that *Rowett* dealt with a motion for new trial based on allegations of newly discovered evidence.

In our case, Sierra Pacific argues that it received an unfair trial because the contents of

the agreement were not disclosed. Hence, it argues that it should be granted a new trial pursuant to Rule 59(a)(1), I.R.C.P. Thus, while *Rowett* and this case involve motions for new trials based upon different subsections of Rule 59(a), there is no substantive reason to distinguish and not apply the rule of *Rowett* to our case. In both instances wise appellate review should only require the ordering of a new trial where there is a probability that a different result would occur upon the completion of the new trial. To rule otherwise would foster unnecessary litigation and expenses—something which was never intended to occur under Rule 59(a).

670, 675 (1967). *Dinneen* makes clear, then, that although the decision to grant a new trial is *discretionary*, the weighing process is *mandatory*.

■ The trial court's summary denial of Sierra Pacific's motion for new trial precludes us from determining whether the standards of *Dinneen* have been properly applied. We cannot tell what evidence the trial court weighed and compared in deciding to deny Sierra Pacific's motion. We cannot even tell if the trial court weighed the evidence in the first instance. In short, we are unable to determine whether the district court abused its discretion in ruling as it did. Based upon such a record as we have here, we are incapable of reviewing the district court's decision. We therefore remand for the entry of findings on this issue.

Our reasons for requiring the trial court to express its reasons were well-stated by the Court of Appeals in *Sheets v. Agro-West, Inc.*, 104 Idaho 880, 888–89, 664 P.2d 787, 795–96 (Ct.App.1983), which we now adopt:

> Appellate review of judicial discretion should not be result-oriented. An appellate court should not focus primarily upon the outcome of a discretionary decision below, but upon the process by which the trial judge reached his decision. In order for the appellate court to perform this function properly, it must be informed of the reasons for the trial court's decision. Unless those reasons are obvious from the record itself, they must be stated by the trial judge. Where the reasons are neither obvious nor stated, the appellate court is left to speculate about the trial court's perception of the law and knowledge of the facts. As a practical matter, the appellate court finds itself locked into a result-oriented review.
>
> [Not] every discretionary act must be accompanied by a statement of reasons. Many discretionary acts relate to the management of litigation, and do not directly affect the outcome of litigation. Examples of management discretion in-clude the calendaring of cases, supervision of voir dire examinations of jurors, setting reasonable limits upon rebuttal testimony, and the like. These discretionary functions are seldom reviewed on appeal. When they are, we customarily uphold the trial court's action because appellate interference would unduly disturb the efficient operation of the trial courts. The exercise of such management discretion ordinarily does not carry with it an obligation to state particular reasons of record.
>
> [Of] greater concern is ... the exercise of adjudicative discretion—discretion which determines or directly affects the outcome of litigation. Criminal sentencing, and child support, visitation and custody, are areas where discretion determines the outcome of a case. Granting relief from a default judgment and granting a new trial are examples of discretion which directly affects the outcome of litigation. Such acts of adjudicative discretion frequently are subjected to appellate review. Our deference to trial court action in these cases usually is based upon a recognition that the trial judge has actively participated in the proceedings below. *E.g., Smith v. Great Basin Grain Co.*, 98 Idaho 266, 561 P.2d 1299 (1977). The trial judge is in a better position than are we to evaluate the peculiar circumstances of each case, and to select among the available legal alternatives. A statement of reasons for the trial judge's decision—unless otherwise obvious—is necessary to justify such appellate deference.
>
> ... [T]he time has come to require that a trial judge provide a statement of reasons when he grants a motion for a new trial. This exercise of adjudicative discretion has a substantial impact upon the litigants. It deprives the prevailing party of the benefit of victory, and it relieves the losing party of the burden of defeat. It confronts the parties with the prospect of investing considerable time, effort and money in a second trial. When a second trial does occur, it con-

sumes the limited resources of our courts and disrupts the private lives of another set of jurors. Although an order for a new trial may not infringe upon trial by jury in a constitutional sense, it certainly represents a judicial invasion of the province of the first jury which sat in the case. *See* Comment, *Ruling on the New Trial Motion: What Standard for the Trial Judge,* 17 IDAHO L.REV. 249 (1981).

Discretion in ordering new trials cannot be eliminated by imposing rigid rules. Discretion is necessary to enable the trial judge to individualize his decision with respect to each unique case. *See generally* Rosenberg, *Judicial Discretion of the Trial Court, Viewed from Above,* 22 SYRACUSE L.REV. 635 (1971). When reviewing a decision to grant [or deny] a new trial, an appellate court needs to know more than the result and the provision of a rule or statute which authorized the result. The appellate court should not be compelled to guess at the trial court's reasoning. Moreover, the process of identifying and articulating reasons for granting [or denying] a new trial is a healthy discipline for trial judges. It is, perhaps, our best safeguard against "abuse of discretion."

As we stated in *Dinneen,* the review of a claim of excessive or inadequate damages is "the *duty* of the trial court and should not be left for appeal." *Dinneen, supra,* 100 Idaho at 626, 603 P.2d at 581 (emphasis added). The reason for this is readily apparent: "The trial court has a far better opportunity [than an appellate court] to weigh the demeanor, credibility, and testimony of witnesses, and the persuasiveness of all the evidence." *Id.; see also Rosenberg v. Toetly,* 93 Idaho 135, 139, 456 P.2d 779, 783 (1969). Because "[a]ppellate review [on this issue] is more limited," *Dinneen, supra,* 100 Idaho at 626, 603 P.2d at

581,[14] we remand to the district court to weigh the evidence in the first instance, and "then compare the jury's award to what he would have given had there been no jury. If the disparity is so great that it appears to the trial court that the award was given under the influence of passion or prejudice, the verdict ought not stand. It need not be proven that there was in fact passion or prejudice nor is it necessary to point to such in the record." *Id.,* at 625–26, 603 P.2d at 580–81. After weighing and comparing the evidence the district court shall also state the grounds upon which it reaches its conclusion. We, of course, express no opinion at this time about whether the amount of the jury's compensatory awards are proper.

## III. THE AWARD OF PUNITIVE DAMAGES WAS PROPER

Sierra Pacific argues that the trial court abused its discretion in submitting the question of punitive damages to the jury. It further argues that even if an award were proper, the trial court abused its discretion in failing to find that the $750,000 amount was excessive. We disagree with Sierra Pacific's first argument and remand to the district court with respect to the second argument.

### A. Background.

■ Punitive damages are "not favored in the law and therefore should be awarded only in the most unusual and compelling circumstances." *Cheney v. Palos Verdes Investment Corp.,* 104 Idaho 897, 904–05, 665 P.2d 661, 668–69 (1983). The policy behind such damages is deterrence rather than punishment. *Id.* at 905, 665 P.2d at 669. "An award of punitive damages will be sustained on appeal only when it is shown that the defendant acted in a manner that was 'an extreme deviation from reasonable standards of conduct, and that

---

**14.** Appellate review is more limited than that which the trial court may do because of the appellate court's necessary reliance upon a cold record. While the appellate court still is obligated on appeal to review the evidence, it is not in a position to "weigh" the evidence as a trial

court can. *Id.* Accordingly, the reviewing court's power over claims of excessive or inadequate verdicts "exists only when the facts are such that the excess or inadequacy appears as a matter of law." *Id.* (citations omitted).

the act was performed by the defendant with an understanding of or disregard for its likely consequences.'" *Id.* (Citation omitted.) "The justification for punitive damages must be that the defendant acted with an extremely harmful state of mind, whether that state be termed 'malice, oppression, fraud, or gross negligence.'" *Id., quoting Morrison v. Quality Produce, Inc.,* 92 Idaho 448, 450, 444 P.2d 409, 411 (1968).

■ The decision of whether to submit the question of punitive damages to the trier of fact rests within the discretion of the trial court. *Cheney, supra,* 104 Idaho at 904, 665 P.2d at 669 ("[A]n award for exemplary damages should be left first to the determination of the trier of fact.... Such deference to the trial court is consistent with the appellate overview of compensatory damages."); *Duty v. First State Bank of Oregon,* 71 Or.App. 611, 693 P.2d 1308, 1315 (1985), *review denied,* 298 Or. 822, 698 P.2d 963 (1985); *State v. Haley,* 687 P.2d 305, 320 (Alaska 1984); *Schmidt v. American Leasco,* 139 Ariz. 509, 679 P.2d 532, 535 (Ct.App.1983); *Branch v. Western Petroleum, Inc.,* 657 P.2d 267, 278 (Utah 1982); *Newman v. Basin Motor Co.,* 98 N.M. 39, 644 P.2d 553, 558 (Ct.App. 1982); *Mince v. Butters,* 200 Colo. 501, 616 P.2d 127, 129 (1980); *Kelly Broadcasting Co., Inc. v. Sovereign Broadcast, Inc.,* 96 Nev. 188, 606 P.2d 1089, 1093 (1980).

The issue of an alleged excessive award of punitive damages also is "largely within the discretion of the trial judge." *Cheney, supra,* 104 Idaho at 905, 665 P.2d at 669. Because punitive damages by their nature are "incapable of definite ascertainment and cannot be governed or measured by any precise standards," *id.,* at 904, 665 P.2d at 660, *quoting Cox v. Stolworthy,* 94 Idaho 683, 688, 496 P.2d 682, 687 (1972), the "true basis for an award of one amount of punitive damages as opposed to another amount lies in an overall appraisal of the circumstances of the case." *Boise Dodge, Inc. v. Clark,* 92 Idaho 902, 908, 453 P.2d 551, 557 (1969). Applying these rules to this case, we affirm the district court's decision to submit the issue to the jury.

B. *Evidence Exists to Support an Award of Punitive Damages and the District Court Did Not Abuse Its Discretion in Submitting the Issue to the Jury.*

■ The facts of this case compellingly justified both the trial court submitting the question of punitive damages to the jury and the jury awarding punitive damages. The facts included the following:

(1) Sierra Pacific employees used a bolt which, according to maintenance manuals, was both the *wrong size and strength* to connect the pilot's controls with the plane's elevator devices.

(2) The employees installed the bolt *backwards.*

(3) The employees *never* secured the bolt with a nut and cotter pin. Instead, the bolt was allowed to hold the pilot's controls and the elevator devices together by *mere tension.*

(4) Inexplicably, maintenance forms surrounding the reassembly of the pilot's control rods to the elevator devices came up *missing.* Identical forms covering identical maintenance performed on two other similar planes at the same time as the plane in this case nevertheless were found. No explanation for the mysterious disappearance of the crucial forms was ever offered, which disappearance violated Federal Aviation Administration rules.

(5) Numerous other maintenance record and quality control irregularities pervaded Sierra Pacific's operations.

(6) Sierra Pacific employees signed maintenance forms stating that they had checked and rechecked the bolt in question approximately one year after its installation and found no problems. Evidence at trial conclusively showed that had the employees properly inspected the bolt, they would have discovered that it was not secured by either a nut or a cotter pin, and that it was too small to use in the first place. *Thus, the jury could have found that these employees either lied about*

*this required inspection or did in fact inspect the bolt, callously and shockingly permitted the unfastened bolt to continue to hold the devices together.* In either event, their behavior on this point is inexcusable.

(7) Sierra Pacific leased the plane in issue to Transwestern Airlines for use as a *commercial* airplane; Sierra Pacific knew that scores of people would use the plane as a mode of travel.

The above evidence conclusively showed that Sierra Pacific acted in a manner that the jury could have found was "an extreme deviation from reasonable standards of conduct." *Cheney, supra,* 104 Idaho at 905, 665 P.2d at 669. Innocent lives were placed in extreme jeopardy as the result of *grossly negligent* conduct committed over a long period of time. *See Cheney, supra,* at 905, 665 P.2d at 669. The evidence demonstrated that federal maintenance standards were violated, maintenance manual instructions were ignored, and either outright fraud was committed or a callous indifference to the safety of passengers was exhibited. Accordingly, the trial court was correct in committing to the wisdom and experience of the jury the decision of whether to award punitive damages. The trial court instructed the jury on punitive damages in a manner consistent with the law we have set forth above. We find no error or abuse of discretion in the giving of the instructions or in the jury's consideration of the issue. Hence, we hold that the evidence in this case justified a jury's award of punitive damages.

■ We decline to review whether the district court abused its discretion in holding that the $750,000 punitive damage award was not excessive. Because Sierra Pacific's motion for a new trial based on excessive damages also included an argument that the punitive damage award was excessive, and because the district court has yet to articulate its reasoning for denying Sierra Pacific's motion on this issue, pursuant to Part II of our opinion above, we likewise remand to the district court to

state the grounds of upon which it decides this issue.

In so doing, the court will apply the *Dineen* standard quoted above, *see ante,* p. 721, and ascertain whether the punitive damage award appears to have been given "under the influence of passion or prejudice." *Dineen, supra,* 100 Idaho at 625, 603 P.2d at 580. In applying *Dineen* to an allegation of an excessive award of punitive damages, it is important to note, as quoted above, that "punitive damages are by their very nature incapable of definite ascertainment and cannot be governed or measured by any precise standards." *Cheney, supra,* 104 Idaho at 904, 665 P.2d at 660, *quoting Cox, supra,* 94 Idaho at 688, 496 P.2d at 687. An "overall appraisal of the circumstances of the case," *Boise Dodge, supra,* 92 Idaho at 908, 453 P.2d at 557, is necessary to determine if the award will adequately serve as "a deterrent to similar future conduct." *Cheney, supra,* 104 Idaho at 905, 665 P.2d at 661.

In summary, we affirm the district court's decision to submit the issue of punitive damages to the jury, and in the propriety of an award in this case. We remand to the district court to determine whether the amount of punitive damages is excessive. As in Part II of our opinion above, we also direct the district court to state the grounds upon which it bases its conclusion.

IV. VARIOUS EVIDENTIARY RULINGS OF THE DISTRICT COURT DID NOT PREJUDICE SIERRA PACIFIC.

Sierra Pacific urges numerous instances in which the district court erred in ruling on evidentiary matters, and that these rulings impermissibly prejudiced its case. We address each allegation in turn.

A. *Admission of Evidence Relating to Sierra Pacific's Maintenance Practices Was Relevant and Properly Admitted.*

■ Sierra Pacific objects to evidence about its maintenance practices and records of the plane in question during the

time prior to the accident. Its argument is that the evidence was not relevant. We disagree.

The National Transportation and Safety Board's investigation discovered that the M-6 form that would have covered the reinstallation of the flight controls on the plane here in question was missing. Sierra Pacific and Board investigators were unable to determine if the form was ever prepared, lost, misplaced, or destroyed. The fact that the form was missing, however, made relevant an inquiry into Sierra Pacific's record keeping system and procedures. The numerous discrepancies in Sierra Pacific's maintenance practice and procedures discovered by the Board were relevant in explaining why the M-6 form was never found. The evidence was also relevant to plaintiffs' punitive damages claim.

The evidence was also relevant in explaining how the inadequately sized bolt could have been used, without ever being secured with a nut or cotter pin. The evidence was further relevant in addressing how Sierra Pacific did not discover the improperly sized and unsecured bolt. The fact is that had Sierra Pacific conducted normal maintenance procedures, it should have discovered the serious errors.

Rule 401 of the Idaho Rules of Evidence defines relevant evidence as any "evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (Emphasis added.); *see Harkness v. City of Burley*, 110 Idaho 353, 715 P.2d 1283 (Sup.Ct. No. 15793, issued Feb. 2, 1986). In comments to the rule, it is stated that Rule 401 is to be interpreted broadly. Furthermore, it is the rule in Idaho that "[t]he trial court has broad discretion as to the admission of evidence, including business records, and the exercise of that discretion will not be overturned absent the clear showing of abuse." *Cheney, supra*, 104 Idaho at 900, 665 P.2d at 664. (Citations omitted.) Trial judges also are granted broad discretion in determining relevancy. *Marks v. Vehlow*, 105

Idaho 560, 569 n. 9, 671 P.2d 473, 482 n. 9 (1983). The facts of this case convince us that the evidence was relevant, and that the trial court did not abuse its "broad discretion," *Cheney, supra*, 104 Idaho at 900, 665 P.2d at 664, in admitting it.

B. *Results of the National Transportation and Safety Board's Investigation Were Not Improperly Admitted.*

■ In a motion *in limine*, Sierra Pacific requested that pursuant to federal law, the results of the National Transportation and Safety Board's investigation be excluded. The trial court, in interpreting the federal law, ruled that no conclusions or opinions from the report could be offered into evidence. As a result, the report itself was never offered as an exhibit.

During the course of trial, specific *factual findings* of various investigatory subgroups of the Board were introduced and discussed. At no time did counsel for Sierra Pacific object to the admission of these reports or the testimony given, and we cannot see how introduction of this factual evidence was improper because it did not involve any conclusions or opinions.

Our review of the record convinces us that the district court's *in limine* order was not violated and that the court did not abuse its broad discretion in admitting the evidence it did. *Id.* In any event, even if Sierra Pacific could argue impermissible prejudice, it waived such argument by failing to object. *Erikson v. Nationwide Mutual Insurance Co.*, 97 Idaho 288, 291, 543 P.2d 841, 844 (1975); *Adams v. Cheney*, 661 P.2d 434, 441-42 (Mont.1983).

■ Although the jury was never told *what* opinions the Board reached, it was instructed that the Board did reach opinions. This was contained in Instruction No. 10, which stated that federal law prohibits the introduction of opinions of Board investigators. Therefore, the instruction stated, when a Board investigator in a deposition or at trial declined to offer an opinion as a result of a certain question, the reason for his or her declining was due to

the requirements of federal law and not because the investigator was unable to reach an opinion as a result of insufficient evidence. This instruction did not impermissibly prejudice Sierra Pacific, and was beneficial in ensuring that the jurors would not be confused by some of the investigators' responses. We therefore affirm the district court on this point.

C. *Sierra Pacific has Shown No Impermissible Prejudice in the District Court's Handling of Objections.*

Sierra Pacific next contends that the trial court impermissibly allowed argument before the jury concerning objections made. This contention is without merit. Sierra Pacific has made no reference to any specific argument before the jury concerning an objection which allegedly prejudiced it. We found no such instances. We therefore affirm the district court on this point.

D. *Evidence of the Purported Silence of Sierra Pacific Employees was Properly Admitted.*

██ Sierra Pacific claims that "numerous" times, Appellant's Opening Brief, p. 35, the trial court allowed in as evidence testimony regarding the silence of Sierra Pacific employees. It cites, however, only one example.

Counsel for Soria asked Alan Gorejko, a products safety investigator for deHavilland and a member of the Board's investigatory team, if Sierra Pacific employee Dave Folkins, head of Sierra Pacific's maintenance department and also a member of the investigatory team, had at any time registered an objection to findings and conclusions of the metallurgical examinations done in Washington. Counsel for Sierra Pacific objected on grounds of irrelevancy and lack of foundation. The district court overruled the objection. Gorejko responded that Folkins stated he would like his experts to review the evidence. Gorejko also stated that Folkins at no time personally objected to the test's results.

Our discussion of relevancy above is applicable here, and convinces us that the evidence was properly admitted. The official meetings with the Board were held with the purpose of learning the cause of the accident. Folkins was a member of the investigatory team. He was a primary representative of the company which was obviously under Board scrutiny. The Board was developing facts in order to issue a report of their conclusions and opinions. Sierra Pacific was potentially subject to federal sanctions. Certainly, Folkins was obligated to speak up if he was in possession of any contrary facts, and indeed, it would make absolutely no sense for him to keep silent. For this reason, the fact that Folkins did not object to the findings of the investigators or bring any other additional evidence to the Board is relevant as to the veracity of these findings. We therefore affirm the district court on this point.

E. *Other Alleged Evidentiary Errors are Without Merit and Need Not be Discussed.*

Sierra Pacific also alleges that various hearsay statements were improperly admitted into evidence and that several witnesses were not competent to testify about the facts they knew or the opinions they had formulated. These allegations are without merit. With respect to its numerous hearsay allegations, the record shows that the evidence in question was either not hearsay or was not properly objected to by counsel. Furthermore, much of the objected to evidence also was testified to by other direct sources.

With respect to witness competency, our review convinces us that in no instance did the trial court abuse its discretion in permitting the various witnesses to testify as they did. Accordingly, we affirm the district court's evidentiary rulings.

V. THE DISTRICT COURT DID NOT ERR IN AWARDING DEHAVILLAND AND WESTERN AIRCRAFT MAINTENANCE THEIR COSTS.

In its opening brief, Sierra Pacific alleged as error the award of costs to deHavilland and Western Aircraft Maintenance.

It failed to specify what the error is alleged to be. Furthermore, it cited no law on the matter and made no argument. Under I.A.R. 35(a)(6) this Court has held that "the failure to support the alleged assignment of error with argument and authority is deemed a waiver of the assignment." *State v. Burris*, 101 Idaho 683, 684 n. 1, 619 P.2d 1136, 1137 n. 1 (1980); *Knudson v. Bank of Idaho*, 91 Idaho 923, 933, 435 P.2d 348, 358 (1967). We therefore decline to review this alleged error.

## VI. THE DISTRICT COURT DID NOT ERR IN REFUSING TO GRANT ATTORNEY'S FEES BELOW.

Plaintiffs argue that the district court abused its discretion in not awarding attorney's fees below. We disagree.

■■■ An award of attorney's fees is only proper when an action was either brought or defended frivolously, unreasonably, or without foundation. *Golder v. Golder*, 110 Idaho 57, 61, 714 P.2d 26, 30 (1986); I.R.C.P. 54(e)(1); I.C. § 12-121. The determination to award or not award such fees is committed to the discretion of the trial court. *Golder, supra,* 110 Idaho at 61, 714 P.2d at 30.

■■■ In view of the large damage claims against Sierra Pacific—totaling over $3.5 million dollars in the plaintiffs' complaints—and the complexity of the case, we cannot say that the district court abused its discretion in ruling as it did. While we might have reached a different result were we reviewing this issue *de novo*, we are not so reviewing, and are of the firm opinion that no clear abuse of discretion occurred here.

For the foregoing reasons, we affirm in part and remand in part for further proceedings not inconsistent with that which we have stated. Costs to respondents deHavilland and Western Aircraft Maintenance; no attorney's fees.

DONALDSON, C.J., and HUNTLEY, J., concur.

SHEPARD, J., concurs in the result.

BAKES, Justice, dissenting:

I agree with the result reached by the majority in Part II of its opinion regarding the standard to apply to motions for new trial based on excessive or inadequate damages. However, that issue is relatively minor insofar as this appeal as a whole is concerned.

The central issue on appeal, which the majority misses, is whether Sierra Pacific has been denied its fundamental due process rights, including: (1) the right to a fair trial before an adequately informed jury (which implicates the right to effective cross examination); and (2) the right to a *meaningful* opportunity to participate in and be heard on motions before the court. Instead the majority focuses on the result obtained in the trial below without carefully considering the means by which that result was obtained. I believe the means utilized were so infirm, they substantially infected the trustworthiness of the result obtained. Thus, because of the majority's failure to properly focus on the essential issue of this appeal, this Court may unwittingly be establishing law which will undermine our system of civil justice to the detriment of future plaintiffs and defendants alike.

### I

In a classic case of not being able to see the forest for the trees, the majority's view of Sierra Pacific's arguments on appeal is obscured by its preoccupation with the single issue of whether the settlement agreement constitutes a so-called "Mary Carter" agreement. The majority fails to address the essence of appellant's argument, which is that it was denied a fair trial before an adequately informed jury. That such a trial was not had in the present case is clearly disclosed by the record on appeal.

In establishing their case, plaintiffs relied *entirely* on the testimony of witnesses obtained by some of the defendants with which they settled, particularly those affiliated with defendants deHavilland and Western Aircraft Maintenance. As stated

by counsel for plaintiffs in closing argument:

"Let me first point out something rather unique about this case, though. If you look back ... we have proved our case on liability *out of the mouths of the defendants' own witnesses....* So our case was .. expert witnesses in the employ of defendants. Not one hired gun testified on our behalf. We did not go out and hire high-powered, fancy experts to come in, pay them large amounts of money to testify on our behalf. We proved the case through the mouths of the defendants' own witnesses."

Thus, Sierra Pacific's defense rested entirely on its ability to undermine the testimony of these witnesses who were supposedly the "defendants' own." It cannot be seriously questioned that the most effective means to undermine such testimony is to cast doubt on its credibility. One way to attack credibility is to show bias. This is precisely what Sierra Pacific attempted to do when it sought permission at the start of trial to disclose a settlement agreement to the jury, in order to establish that these so-called "defendants' own witnesses" had, as a result of the realignment resulting from the settlement agreement, become plaintiffs' witnesses. Sierra Pacific correctly argued that its purpose in seeking disclosure was to inform the jury of the true alignment of the parties so that the jury might fully judge the credibility of the witnesses who would testify. However, at a hearing before the trial court, from which appellant Sierra Pacific was excluded, the trial court heard the plaintiffs' counsel's oral description of what the settlement agreement contained. Emerging from that briefing by plaintiffs' counsel, the trial court advised the defendant-appellant Sierra Pacific that it would not be allowed to put on any evidence of the settlement agreement, or to cross examine plaintiffs' witnesses about it in any attempt to show bias or attack their credibility.

Sierra Pacific's motive in seeking disclosure of the agreement is entirely consistent with our rules of evidence. Rule 408 of the Idaho Rules of Evidence (I.R.E.) provides as follows:

**"Rule 408. Compromise and offers to compromise.**—Evidence of (1) furnishing, offering, or promising to furnish, or (2) accepting, offering, or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for, invalidity of, or amount of the claim or any other claim. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule does not require exclusion if the evidence is offered for another purpose, such as *proving bias or prejudice of a witness,* negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." (Emphasis added.)

Although the adoption of Rule 408 was not effective until July 1, 1985, after the trial in this case, it had previously been approved by this Court. In *Hatfield v. Max Rouse & Sons Northwest,* 100 Idaho 840, 606 P.2d 944 (1980), we expressly adopted the position of Rule 408. In *Hatfield* we held that statements made in the course of settlement negotiations were not admissible to prove liability or the invalidity of a claim or its amount, as Rule 408 provides. We relied specifically on Federal Rule of Evidence 408, quoting it with approval in its entirety and expressly adopting its position. *Hatfield v. Max Rouse & Sons Northwest,* 100 Idaho at 846, 606 P.2d at 950.

Federal Rule of Evidence (F.R.E.) 408 is identical to I.R.E. 408, and the federal courts have uniformly interpreted the rule as permitting the disclosure of settlement agreements for purposes other than to prove liability or the invalidity of a claim or its amount. *See Branch v. Fidelity & Casualty Co. of New York,* 783 F.2d 1289, 1294 (5th Cir.1986); *McInnis v. A.M.F., Inc.,* 765 F.2d 240, 248 (1st Cir.1985);

*Brocklesby v. United States,* 767 F.2d 1288 (9th Cir.1985); *Parker v. O'Rion Industries, Inc.,* 769 F.2d 647 (10th Cir.1985); *Belton v. Fibreboard Corp.,* 724 F.2d 500, 505 (5th Cir.1984); *Reichenbach v. Smith,* 528 F.2d 1072 (5th Cir.1976).

In *Brocklesby v. United States, supra,* the Ninth Circuit, in a case involving the suit of survivors of an airplane crash against the government and the publisher of an allegedly defective instrument approach chart, held that an indemnity or settlement agreement between the defendants was admissible in evidence. Prior to trial the defendants had entered into a "stipulation of compromise" settlement in which they sought to resolve the claims between them. Over defendant's objection, the agreement between the government and the publisher was entered into evidence by plaintiffs. Plaintiffs' purposes in having the settlement agreement admitted were twofold. "First, the plaintiffs argued that the indemnity agreement was admissible to show the relationship of the parties. The plaintiffs contended that the indemnity agreement showed that Jeppesen and the government were not adverse. Second, the plaintiffs argued that the indemnity agreement was admissible to attack the credibility of the witnesses for Jeppesen and the government." 767 F.2d at 1292–93. On appeal, the Ninth Circuit held that the district court was correct in admitting the agreement into evidence since the trial court found that the purposes for admitting the evidence were distinct from proving liability or invalidity of a claim or its amount. The Ninth Circuit also specifically found that admitting the indemnity agreement to show that parties to the suit were not in fact adverse was proper.

"The test, however, is not whether the relationship of the parties was an operative fact in the case, but whether it was 'relevant' within the meaning of Rule 401. *Evidence relating to the relationship of the parties is relevant because it tends to make their respective positions less credible." Id.,* n. 2 (emphasis added).

Thus, in a case very similar to the present case, the federal courts have held that settlement agreements are admissible for the purpose of either attacking the credibility of witnesses or for showing a non-adverse relationship between the parties to a suit.

In two cases out of the Fifth Circuit, that court has held that admission of a settlement agreement into evidence does not violate Rule 408 when the purpose of admitting such evidence was to "prevent confusion of the jury." *Belton v. Fibreboard Corp.,* 724 F.2d 500, 505 (5th Cir.1984); *Reichenbach v. Smith,* 528 F.2d 1072 (5th Cir.1976). Additionally, in *Reichenbach,* the Fifth Circuit held that in determining "whether to permit or limit cross examination of a party ... concerning a settlement agreement with a co-defendant, the trial court must balance the policy of encouraging settlements with the need for evaluating the credibility of witnesses.... *The importance of informing the jurors fully so that they can carefully judge the credibility of each witness in making their fact determination may in some situations outweigh the desire to encourage settlements.*" 528 F.2d at 1075 (emphasis added).

Thus given the uniform interpretation of Federal Rule of Evidence 408 which is identical to the Idaho rule, it is clear that admission of the settlement agreement in the instant case for purposes of showing non-adverseness of the parties or for showing witness bias was not only proper, but necessary.

Having requested disclosure of the agreement for the purpose of showing non-adverseness of the parties, so that the jury could adequately judge the credibility of such witnesses, the burden was on the parties to the agreement to establish some other grounds for non-disclosure. The burden was *not* on Sierra Pacific, as intimated in the majority opinion, *ante* at 719, to show that exclusion of the evidence would prejudice its case. Such an assertion by the majority evinces a fundamental misunderstanding of the Rules of Evidence. Having offered relevant evidence for a per-

missible purpose, the burden is on its opponent (not on the proponent) to show that prejudice will result from its admission. Failure to make such a showing results in admission of the evidence. The record on appeal is completely devoid of any suggested basis for withholding knowledge of the agreement from the jury.[1] Neither the parties to the agreement nor the trial judge were forthcoming with any reasons why the agreement should not be disclosed to the jury. Apparently unaware of this Court's prior approval in *Hatfield* of the provisions of Rule 408, the trial judge gave the sum of his reasons for withholding the agreement from the jury as follows:

> "We aren't up front with jurors, never have been, never will be. The jury only knows about half what goes on in a trial. You are talking about a Mary Carter Agreement and I don't see any Mary Carter Agreement here. So your motion to disclose to the jury is in all respects denied."

The trial judge appears to have based his decision not to disclose on his conclusion that the agreement was not a "Mary Carter" agreement. But Rule 408 does not require that a settlement agreement be a "Mary Carter" agreement before it may be disclosed to show non-adverseness of parties. Whether or not an agreement is a "Mary Carter" agreement is simply irrelevant to any analysis under Rule 408.

The majority's attempts to impose a necessity requirement to analysis under I.R.E. 408 are likewise without foundation in the rule. I.R.E. 408 does not predicate the admission of settlement agreements otherwise relevant and admissible upon an additional showing by the proponent of the evidence that he "needs" the agreement to show bias. There is no "best evidence" rule, as asserted by the majority, *ante* at 719. Whether or not a party "needs" the settlement agreement to show bias is simply irrelevant to any analysis under Rule 408.

In short, having sought disclosure of the settlement agreement based upon permissible purpose, the burden was upon plaintiffs to object, and failing such objection, or a *sua sponte* determination by the trial court that the settlement agreement could not be disclosed based upon other reasons (*i.e.,* Rule 403), it is clear that the trial court's denial of Sierra Pacific's motion for disclosure was an abuse of discretion; it constituted clear error.

Failing in its analysis under Rule 408, the majority unsuccessfully attempts to argue that the trial court's clear error is nonetheless harmless. The attempt fails, and once again it is because of a fundamental misunderstanding (misinterpretation) of I.R.C.P. 61. The harmless error rule is contained in its entirety in I.R.C.P. 61. The language is clear, unambiguous, and of no need of any additional explanation. Under Rule 61, an error at trial is deemed harmless only if such error "does not affect the *substantial rights* of the parties." I.R.C.P. 61 (emphasis added). There simply is no language in the rule which, by any fair interpretation, requires the additional finding that "a different result would have been probable" without the alleged error. The majority's attempt to place such a gloss on the rule is without support in Idaho case law.[2] The sole Idaho case relied

---

1. The only basis for keeping such information from the jury would be that it is irrelevant to any issue in the case (IRE 401, 402), which is hardly the case here, *see Brocklesby v. United States,* 767 F.2d 1288 (9th Cir.1985) discussed *supra* in the text; or, that even though relevant, such information is unduly prejudicial or would otherwise confuse or mislead the jury (IRE 403). Clearly, IRE 403 is inapplicable. Indeed, without disclosure the jury will be misled as to the true alignment of the parties and will thereby be deprived of a meaningful basis for judging witness credibility.

2. Initially, the majority relies upon a single Utah case for its proposition that the harmless error rule requires a finding that a different result would be had upon retrial. That Utah case, *Bambrough v. Bethers,* 552 P.2d 1286 (Utah 1976), is inapposite because in that case the court was construing a particular and unique Utah rule of evidence, without counterpart in the Idaho Rules of Evidence. The decision in the Utah case was not based upon Utah's Rule of Civil Procedure No. 61 which is identical to Idaho's Rule 61, the harmless error rule.

on by the majority for its proposition is *Rowett v. Kelly Canyon Ski Hill, Inc.,* 102 Idaho 708, 711, 639 P.2d 6, 9 (1981). However, *Rowett* places no such gloss on I.R.C.P. 61. That portion of *Rowett* dealing with I.R.C.P. 61 clearly states that "error would be harmless because it 'does not affect substantial rights of the parties,'" not because a different result would be probable. *Id.* The language of *Rowett* concerning the requirement that a "different result would have been probable" dealt solely with the issue of appellant's motion for new trial based on allegedly newly discovered evidence under I.R.C.P. 59(a)(4).[3] *Rowett* did not impose the requirements of I.R.C.P. 59(a)(4) on the harmless error rule of I.R.C.P. 61. The majority's interpretation of *Rowett* in this regard strains credulity. Whether or not a different result would probably be had on retrial is irrelevant to analysis under I.R.C.P. 61. Such a finding would be entirely speculative. I for one lay no claim to clairvoyance. Rather, under I.R.C.P. 61, if "substantial rights of the parties" have been affected it is presumed that a fair trial was not had and a different result may well ensue on retrial, but whether such *will* be the case is irrelevant to analysis under the harmless error rule.

Given a proper understanding of I.R.C.P. 61, it is inescapable that the error in the present case is *not* harmless. Again, by the admission of counsel for plaintiffs in his closing argument to the jury, plaintiffs' case depended entirely on the weight given by the jury to the testimony of expert witnesses of defendants deHavilland and Western Aircraft Maintenance. "So our case was ... expert witnesses in the employ of defendants.... We proved the case through the mouths of the defendant's own witnesses." The heart of the plaintiffs' case was based on the credibility of those witnesses of the supposedly adverse defendants. To now argue, as does the majority, that denial of Sierra Pacific's sole means for attacking the credibility of those witnesses was harmless error borders on the incredible.

The district court's ruling barring disclosure of the settlement agreement *completely* denied Sierra Pacific the sole means of proving witness bias. The majority argues that this is not so. The majority concludes that "it is clear that Sierra Pacific did not need to introduce the contents of the agreement in order to show witness bias or prejudice." *Ante* at 719. This conclusion is based on two premises: (1) prior deposition testimony of witnesses affiliated with the settling defendants is consistent with their trial testimony; and (2) such deposition testimony was given "long before the ... agreement was entered into." *Ante* at 719. Both premises are without support in the record on appeal.

First, there is no basis in the record on appeal upon which the majority may even assert that depositions of the expert witnesses for deHavilland and Western Aircraft Maintenance *even exist.* The alleged depositions are not in the record. Thus, without establishing the existence of such depositions, I fail to see how the majority may assert that Sierra Pacific "could have used them to impeach any witness it felt was compromising his or her testimony."[4]

---

**3.** In footnote 13, the majority also attempts to extend the requirements of I.R.C.P. 59(a)(4) (*i.e.,* that a different result must be probable upon retrial before a motion for new trial is granted) to motions for new trial in general. "[W]ise appellate review should only require the ordering of a new trial where there is a probability that a different result would occur upon the completion of a new trial. Such an extension is unwarranted and without support in either the express, unambiguous language of Rule 59(a) or case law dealing with Rule 59(a). Since the enactment of the current version of Rule 59(a), this Court has never espoused the "different result" on retrial requirement outside of Rule 59(a)(4), and it would be unwise to engage in such speculative factfinding outside the ambit of Rule 59(a)(4).

**4.** Even if there were depositions before us, inconsistent testimony does not equate with a finding of bias. Showing prior inconsistent testimony is but one way to attack credibility. Prior inconsistent statements and witness bias are two entirely distinct methods of attacking credibility. The majority's argument does not even address the issue of bias as a basis of cross examination.

Second, even if such depositions do exist, and even if they may have been taken before the settlement was actually agreed to, we do not know whether they were taken prior to the time when the agreement was being negotiated by the parties. If such depositions do in fact exist, and were taken during the time when the parties were *contemplating* entering into the settlement, it may well be that the deposition testimony was affected by such a contemplated agreement, *i.e.*, deposition testimony may have been given with the view that a settlement agreement ultimately would be entered into.[5] Thus, without support for either premise, the majority's conclusion must fall. Because the appellant Sierra Pacific was denied the means to obtain the information necessary to make a showing regarding bias, the case must be remanded for a new trial.

The remaining reasons given by the majority as to why the trial court's error is harmless are likewise makeweight. They fail as a whole to explain away the fact that Sierra Pacific's due process right to a fair trial, including the right of adequate cross examination of adverse witnesses, has been denied. Sierra Pacific was barred from the proceedings in which the agreement was explained to the trial judge, and then Sierra was barred from disclosing the agreement to and discussing it in front of the jury. Sierra was also denied the right to show bias in plaintiffs' witnesses through cross-examination regarding the

settlement. Indeed, the reasons allegedly supporting a finding of harmless error are simply a rehashing of arguments relating to admissibility of "Mary Carter" agreements. *See* Comment, "The Mary Carter Agreement—Solving the Problems of Collusive Settlements in Joint Tort Actions," 47 S.Cal.L.Rev. 1393, 1400–01 (1974) (acts indicative of "Mary Carter" agreements include: agreeing defendant's abandonment of earlier pleaded defenses; agreeing defendant's admission of liability during trial; agreeing plaintiff's leading ostensibly, though in fact, non-adverse witnesses in order to effectively control their testimony). However, the majority's "Mary Carter" reasoning is of no avail; it is beside the point. The whole "Mary Carter" issue of admissibility is rendered moot by I.R.E. 408.[6]

Substantial rights of Sierra Pacific have not only been "affected," I.R.C.P. 61, they have been *completely denied* by the trial court's ruling regarding disclosure of the agreement to the jury. The district court's error cannot be said to be harmless. It has undermined the very substance of our civil justice procedures which ensure to both plaintiff and defendant alike a fair trial before an adequately informed jury. The function of a jury trial was properly characterized by plaintiffs' counsel during closing argument, paraphrasing earlier statements by the trial judge.

"Now, his Honor said to you a few moments ago ... that nobody will triumph

---

**5.** The majority asserts in footnote 9, ante at 719, that the date of the settlement agreement is known. However, the majority's reference to statements by counsel for Western Aircraft Maintenance are inaccurate. In the first place, the statements were made by counsel for plaintiff Soria at a hearing where appellant's counsel was excluded. And, in the second place, they are ambiguous at best, indicating that *part* of the settlement agreement was entered into during the *voir dire* portion of trial. The only sure information given by the record on appeal is the date when counsel for Sierra Pacific *discovered* the existence of the settlement agreement, which was just prior to the *ex parte* hearing.

**6.** The majority's argument that "Sierra Pacific cannot point to one instance where witnesses representing deHavilland or Western Aircraft

Maintenance [the settling defendants] testified against their own interests ... [or] concede liability," is meaningless. Of course they didn't concede liability or testify against their interests. The terms of the *oral* settlement agreement, as described by plaintiffs' counsel to the court *in camera*, specifically provided that if the settling defendants did in any way concede liability *the agreement was off!*

"[A]ssuming deHavilland and Western Aircraft [do] not get up and admit liability or get caught in a position where their witnesses were impeached, that they had lied or whatever, in other words if the contingencies of trial worked out, ... we [plaintiffs] were going to ... dismiss them from the case ... provided they perform as they thought they could and nothing came from the sky."

here unless the truth has been ascertained. And that is true. I wholeheartedly agree with that because that is what our system is all about. And a trial has been defined, and I think accurately, as an intensive search for truth. And that is what we have been involved in here."

What counsel failed to explain to the jury was that, in this "intensive search for truth," a significant untruth had been forged by the plaintiffs, in concert with the defendants deHavilland and Western Aircraft Maintenance. In short, from the moment the jury sat as trier of fact, a misrepresentation was perpetrated on it and perpetuated throughout the course of trial. The "intensive search for truth" in the present case has been frustrated. Sierra Pacific's ability to engage in meaningful cross-examination, the "greatest legal engine ever invented for the discovery of truth," *California v. Green*, 399 U.S. 149, 159, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970), was completely impaired by the trial court's refusal to permit plaintiffs' witnesses to be cross examined for bias resulting from the settlement agreement. Nevertheless, the majority is now heard to argue that such frustration of the "intensive search for truth" is "consistent with substantial justice," I.R.C.P. 61, and is therefore harmless, non-reversible error. I cannot, in good faith, join in such an argument.[7]

## II

Not only was Sierra Pacific denied due process during trial (no cross examination to show bias), it was also denied procedural due process concerning its motion to the court for disclosure of the contents of the settlement agreement.

In *Rudd v. Rudd*, 105 Idaho 112, 666 P.2d 639 (1983), the unanimous Court held: "The right to procedural due process guaranteed under both the Idaho and United States Constitutions requires that a person involved in a judicial process be given meaningful notice and a *meaningful* opportunity to be heard." 105 Idaho at 115, 666 P.2d at 642. Under the facts of the present case, I believe Sierra Pacific has been denied its procedural due process rights because it was not given "meaningful opportunity to be heard" on the question of whether or not the settlement agreement between plaintiffs and the settling defendants required disclosure to the jury to show bias or non-adverseness of the parties. The *in camera* hearing from which the non-settling defendants were barred constituted, in effect, an *ex parte* communication initiated by plaintiffs' counsel. Following the *in camera* hearing, the court indicated to the non-settling defendant Sierra Pacific that in his opinion the agreement did not constitute a "Mary Carter" agreement. However, the district court was not forthcoming with his reasons for so holding or with any findings of fact upon which his conclusion was based. The court did eventually tell the non-settling defendants that as he understood the agreement it was simply that "if the case develops as indicated in the opening statements, then the plaintiffs will at some time move to dismiss the defendants deHavilland and Western Air." However, there was much more to the agreement which was not disclosed to the non-settling defendants. Furthermore, since the appellant Sierra Pacific was not allowed to inquire into the settlement, it is not even certain that the entire agreement was disclosed to the trial judge.

---

7. Perhaps the most telling sign of an inadequate "search for truth" in this case, is found in the majority opinion itself. The majority repeatedly makes use of the phrase "nothing in the record ..." or "the record fails to show...." The obvious reason why the record is so devoid of information, as expressly recognized by the majority, is that Sierra Pacific was *precluded* from participating in that part of the proceedings and from developing adequate information in the record; it was denied the right to use the most effective means to obtain such information, its right to call witnesses or cross examine. Having recognized the inadequacy of the record, the majority ought to remand for a new trial so an adequate record may be developed rather than use such inadequacy as *carte blanche* to justify its own finding of "harmless error."

Plaintiffs' counsel, at the *in camera* hearing, which was not transcribed until long after the trial has concluded, orally described their understanding that it was "anticipat[ed] that [the settling defendants] would have no reason to blast out of the water our damage witnesses," and that the defendants would "help put on our case ... by, one, perhaps furnishing us with various exhibits" which they would otherwise have a great deal of difficulty obtaining. Given this lack of complete information concerning the agreement, I fail to see how it can possibly be said that the non-settling defendants were given any *meaningful* opportunity to be heard on the question of whether or not the agreement constituted a "Mary Carter" agreement. The non-settling defendants were not permitted to participate in the *in camera* hearing and were kept completely in the dark regarding the agreement. As aptly stated by counsel for Sierra Pacific, "If that is the sum and substance of their agreement, why is it so secretive, why are they afraid to bring it out in the open. That leads me to conclude there must be more to it." I believe the procedure followed in this case denied the appellant due process of law, in violation of both Art. 1, § 13, of the Idaho Constitution and the fourteenth amendment of the United States Constitution.

### III

Not only has the majority sanctioned procedures undermining notions of fair trial and substantial justice, it has also, perhaps unwittingly, sanctioned procedures which will facilitate if not encourage violations of the Canons of Ethics for practitioner and jurist alike.

Our canons of professional and judicial ethics complement the constitutional requirement that parties to an action be accorded an open and fair trial, that they be accorded fundamental due process. The Professional Code of Responsibility, Canon 7, Disciplinary Rule DR7–110B, and the Code of Judicial Conduct, Canon 3A(4), each ensure that fundamental due process rights of parties to litigation are not violated. Both the Code of Judicial Conduct and the Code of Professional Responsibility prohibit *ex parte* communications with the court.

The Code of Judicial Conduct, Canon 3A(4) specifically provides,

"A judge should accord to every person who is legally interested in a proceeding, or his lawyer, *full right to be heard* according to the law, and, except as administrative responsibilities dictate, should not initiate *ex parte* communications concerning a pending or impending proceeding. A judge shall not solicit the advice of any person, except from court or judicial personnel regarding a proceeding before him unless he gives notice to the parties and affords them an opportunity to respond." (Emphasis added.)

Although the trial judge in the present case did not initiate the *ex parte* communication with the attorneys regarding the settlement agreement, I believe the intent of the canon is to preclude all such *ex parte* contacts, particularly in pending cases where the issues are joined and all parties are represented by counsel. I additionally question the prudence of such actions in view of fact that full disclosure of the contents of the hearing held in judge's chambers was not given to the non-settling defendants until an appeal was taken and the transcript prepared. The majority's sanctioning of the procedures utilized in this case will inevitably invite violations of the Canon and prove "antithetical to the adversial process."

Disciplinary Rule 7–110B likewise prohibits certain *ex parte* communications with court officials.

**"DR 7–110 Contact with Officials.**

. . . .

"B. In an adversary proceeding, a lawyer shall not communicate, or cause another to communicate, as to the merits of the cause with a judge or an official

before whom the proceeding is pending, except:

"1. In the course of official proceedings in the cause.

"2. In writing if he promptly delivers a copy of the writing to opposing counsel or to the adverse party if he is not represented by a lawyer.

"3. Orally upon adequate notice to opposing counsel or to the adverse party if he is not represented by a lawyer.

"4. As otherwise authorized by law."

Here, the *ex parte* communication was oral. And although it appears that the notice required by DR 7–110B(3) was given to the non-settling defendants that the plaintiffs were seeking to hold the *in camera* hearing before the trial judge, nevertheless, when the *in camera* hearing was held, counsel for the non-settling defendants were barred from that hearing. The information given the court was intentionally withheld from opposing counsel until months later when the appeal transcript was prepared. While perhaps the letter of the rule was not violated, I believe the spirit of the disciplinary rule is violated by the type of procedure that was followed in this case.

Counsel for the non-settling defendants were not permitted an opportunity to participate in or to be heard concerning the matters discussed in the hearing. They were deliberately excluded from the *in camera* hearing. The purpose of DR7–110B is to prevent the effect or appearance of granting undue advantage to one party. *See* ABA Code of Professional Responsibility, Ethical Consideration 7–35 (1970). Furthermore, the concept of open and public judicial proceedings encouraged by the Code of Judicial Conduct, Canon 3A(4), is of fundamental importance and must be scrupulously followed. I believe that the Canons were not scrupulously followed in the present case.

The errors described above can never be described as harmless. The true gravity of the errors can only be ascertained after the appellant is given the right to examine the witnesses to determine what their bias may have been, based on a full disclosure of the settlement agreement. I would reverse and remand for a new trial.